**RYAN D. HERRINGTON, MD**

1

1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE WESTERN DISTRICT OF OKLAHOMA
   _____

3
   WILLIAM RAY SPRAY, JR., and     )
4  RHONDA JEAN SPRAY, Individually )
   and as Personal Representatives )
5  of the Estate of SINDI LUCILLE  )
   SPRAY, Deceased,                )
6                                  )
                Plaintiffs,        )
7                                  )
           vs.                     )  NO. CIV-20-1252-C
8                                  )
   BOARD OF COUNTY COMMISSIONERS   )
9  OF OKLAHOMA COUNTY, in its      )
   Official Capacity as Governing  )
10 Body of the County of Oklahoma  )
   County,                         )
11                                 )
                Defendant.         )
12 _____

13
            DEPOSITION UPON ORAL EXAMINATION OF

14              RYAN D. HERRINGTON, M.D.

15               May 23, 2023
16             Olympia, Washington
               Pages 1 through 140
17
   _____

18

19        Reported by Karyn Kirouac, CCR #2471

20

21

22

23

24

25

**RYAN D. HERRINGTON, MD**

17

1  Oklahoma County, and that's dated February 1, 2022. So I
2  think I had the wrong year on the invoices I used earlier
3  in my testimony. So February 1, 2022.
4      Q.    (BY MR. SHADID)  Do you know when you -- or do
5  you have anything that tells you when you received
6  materials to start reviewing anything?
7      A.    I don't.  The materials were given to me in a
8  thumb drive, and I don't remember when I received it.
9      Q.    Now, can you tell us approximately how many
10  hours you've put in on this matter.
11      A.    I can.  It's over 15.
12      Q.    Okay.
13      A.    But I just accidentally closed my software
14  again.  Do you want a better number, or is over 15
15  acceptable?
16      Q.    Is that a fair approximation?
17      A.    I would probably add another 5.
18      Q.    Maybe 20 hours, then?
19      A.    That's an approximation.
20      Q.    Okay.  Doctor, I have in front of me
21  Exhibit 38, which I hope in that little book over there is
22  your CV.  Would that be correct?
23      A.    Yes, sir.
24      Q.    Okay.  Now, it tells us that you were board
25  certified with the American Board of Preventive Medicine;

**RYAN D. HERRINGTON, MD**

19

1      Q.      You don't treat patients right now in the field
2    of preventive medicine?
3      A.      We have an opioid -- I'm also an addiction
4    medicine doctor.
5      Q.      In preventive medicine?
6      A.      So my current practice is addiction related;
7    and to be board certified in addiction, you have to have
8    like another board, sort of your base board, if you will,
9    and for me that's preventive medicine.
10     Q.      You are not board certified in internal
11   medicine, are you?
12     A.      No.
13     Q.      You never have been?
14     A.      No.
15     Q.      Have you ever tried?
16     A.      No.
17     Q.      You're not board certified in family medicine?
18     A.      No.
19     Q.      Or in emergency medicine?
20     A.      No.
21     Q.      You have no subspecialty in the area of
22   gastroenterology, do you?
23     A.      No.
24     Q.      And you've never tried, have you?
25     A.      No.

**RYAN D. HERRINGTON, MD**

1    the bottom and bring us up to date.  Under education,

2    according to this you obtained your biology degree in

3    1991.  We can accept that as true, right?

4         A.    It's true.

5         Q.    Your Master's -- or I'm sorry, your medical

6    degree, 1995, at the University of Virginia; that's

7    correct, right?

8         A.    That's correct.

9         Q.    And then Master of Public Health at Ohio State

10   University in 2001?

11        A.    That's correct.

12        Q.    Now, going backwards a little bit under

13   internship and residency training, when it says PGY1/23 --

14   I think I got the Y1/23; what's the PG?

15        A.    Postgraduate.

16        Q.    So in your postgraduate years, the first,

17   second, third year you were in general surgery.  Is that a

18   general surgery residency?

19        A.    Correct.  Correct.  And I just see an error.

20   There should not be a 3 there.  It should just be 1/2.

21        Q.    Okay.

22        A.    And I actually found another error, and that's

23   at the top where it's Ohio State 1997 to 1999, that should

24   say 1999 to 2001; and I actually have an updated resume

25   that has that fixed, and I'd be happy to give that to you.

**RYAN D. HERRINGTON, MD**

1    Q.    Probably should just ask you to -- you can

2  provide that to counsel, and she can give it to me.

3    A.    Happy to.

4    Q.    And then let's go back to postgraduate years 1

5  and 2.  You have a residency in general surgery, and then

6  postgraduate year 3 -- well, they're at different places.

7  1 and 2 are at University of Virginia, and then third year

8  to Orlando Regional Medical Center?

9    A.    That's right.

10    Q.    So you spent three years at least in residency

11  for general surgery?

12    A.    Almost three.

13    Q.    Pardon?

14    A.    Almost three.

15    Q.    Almost three?

16    A.    I left Orlando early because I wanted a change

17  in career, and I had just gotten married and

18  80-hour-a-week workplace style just kind of didn't do it

19  for me anymore.

20    Q.    You weren't thrilled about the 80 hours a week?

21    A.    I was not.

22    Q.    So you never became a surgeon?

23    A.    I never practiced as a surgeon.

24    Q.    You obviously --

25    A.    I was trained as a surgeon to start with, and

**RYAN D. HERRINGTON, MD**

23

1    I --

2        Q.    You never became board certified as a surgeon?

3        A.    I did not.

4        Q.    Did you ever reach the stage of being eligible

5    to sit for board certification for surgery?

6        A.    No.

7        Q.    If I understood correctly, you decided that you

8    didn't want to do the 80-hour-a-week type of thing that

9    surgery possibly required, and so you decided to make a

10   change?

11       A.    Correct.

12       Q.    And the change was -- why don't you tell me,

13   what was the change to?

14       A.    Well, the immediate change was a relocation to

15   Tampa where my spouse was in her fellowship for

16   occupational medicine, and we decided to let her finish

17   that; and then I started a public health and preventive

18   medicine residency the following year at Ohio State.

19       Q.    Your spouse is a physician?

20       A.    Correct.

21       Q.    What is her name?

22       A.    Patricia.

23       Q.    And what does she do?

24       A.    David.

25       Q.    Is David her last name?

**RYAN D. HERRINGTON, MD**

1      A.    Yes.

2      Q.    And the opioid -- and opioid addiction?

3      A.    Yes.

4      Q.    Now, you left there after, looks like, a

5   year -- I'm sorry, about a year and a half, roughly.  Why

6   did you live Vermont again?

7      A.    Dr. David was interested in a change, and she

8   applied for a position at the Labor & Industries

9   department here in Washington State, and she was hired.

10   And throughout our lives together, she's usually followed

11   my career trajectory, and it was high time that I

12   reciprocated.  So I applied for a job with the Washington

13   Department of Corrections, and we moved out west.

14      Q.    Did you have any prior connection to the state

15   of Washington?

16      A.    No.

17      Q.    So from June -- I'm sorry, you came to

18   Washington, according to this, July of 2017 with the

19   Washington State Department of Corrections.  Was this at

20   one particular facility?

21      A.    Yes:  The Stafford Creek Corrections Center.

22      Q.    Where is that?

23      A.    Aberdeen, Washington.

24      Q.    Help me out just a little bit more.  Where is

25   Aberdeen, Washington?

**RYAN D. HERRINGTON, MD**

58

1      Q.    Doctor, on the fourth page of your CV, listed

2  as 38, you've listed two publications, and I know I've

3  read somewhere that those aren't in the last 10 years, are

4  they?

5      A.    They are not.

6      Q.    They don't have anything to do with anything

7  we're talking about in this case, do they?

8      A.    No.

9      Q.    When were these?  How far back?

10     A.    When did I do them?

11     Q.    Yeah, these publications.

12     A.    I did the Madeiros article when I was in

13  college; and I did the ICU recall when I was a senior,

14  when I was a fourth-year medical student.

15     Q.    Now, if you'll turn to the next couple of pages

16  on your CV, it says it's a four-year case history.

17     A.    Would you like an updated?

18     Q.    Possibly, but let me ask you some specifics.

19  You didn't give us, on this list, any case numbers, did

20  you?

21     A.    I don't see case numbers.

22     Q.    How are attorneys supposed to find the cases if

23  you don't help us with the case numbers?

24     A.    I don't know.

25     Q.    You didn't tell us what courts these were in,

**RYAN D. HERRINGTON, MD**

1    did you?

2        A.   I don't see courts listed.

3        Q.   Well, in all honesty and fairness, you were

4    only, according to the Rule 26, required to give us four

5    years, going backwards in time, four years of deposition

6    and/or in-court testimony, and you've actually provided us

7    with some cases that just deal with reports.

8        A.   That's not true.

9        Q.   It's not?

10       A.   No.  If you look, you can see depositions --

11      Q.   I agree, but I'm saying you gave us more than

12    just depositions here.  You gave us some that deal with

13    reports.

14       A.   Correct.

15       Q.   But of the depositions, I believe I counted

16    five depositions on these pieces of paper:  One in 2021 in

17    the case of Stephon Woodley versus Baldwin in Illinois;

18    and one that says Michael Thurmond versus County of

19    Nassau, another 2021 in the state of New York; I see one

20    that says Obie Lovelace versus Harold Clarke in Virginia;

21    I see one that says Bost, that's B-o-s-t, versus Wexford

22    in 2021 in the state of Maryland; I see one in 2019 in the

23    case of Williams v. Wexford Health Sources, also in the

24    state of Maryland.

25          If I missed any on here, please tell me, but

60

1    those -- any other depositions that I missed?  I think

2    that's it.  I just want to make sure I haven't missed any.

3    Did I -- are there any other depos?

4         A.    Just what I've got listed here.

5         Q.    That's what I see anyway.  That's why I'm

6    asking if you see any others, tell me.

7               Then you told me you've given some depositions

8    in the year of 2023.  For just this year, 2023, do you

9    know what states they involve?

10        A.    Am I allowed to cheat?

11        Q.    You don't have to cheat.  You can just check.

12        A.    Let's see.  For 2023, I see one deposition for

13   Connecticut.

14        Q.    Okay.

15        A.    I see one deposition for Illinois -- oh, I've

16   got 2022 for that, except I think that's the year I was

17   retained and I did that one recently, so let's say two.

18   It's easier to remember when you have a list.  One

19   deposition for New Mexico, that's three.  One deposition

20   for Illinois.

21        Q.    Is that a second one for Illinois?

22        A.    Correct.

23        Q.    So that's two for Illinois.

24        A.    One deposition for Alabama, that's five.

25   One -- oh, no, wait.  Sorry.  That's my memory right now.

**RYAN D. HERRINGTON, MD**

61

1      Q.    Okay.  Your memory is with you looking at your
2  computer screen, right?

3      A.   It is, but the dates that are on the document
4  are the dates of retention, and you don't always do a
5  deposition in the year you're retained.  But that is at
6  least a ballpark figure for you.

7      Q.    Doctor, as a physician, does the state of
8  Washington let you make a diagnosis without seeing a
9  patient?

10     A.   I think -- I don't know the answer to that
11  question.

12     Q.    Do you know if the state of Oklahoma lets a
13  doctor make a diagnosis without seeing a patient?

14     A.   I don't know the answer to that.

15     Q.    Do you know if a PA, physician assistant, can
16  make a medical diagnosis anywhere?

17     A.   If a PA can make a diagnosis?

18     Q.    Under their license, can they make a medical
19  diagnosis?

20     A.   Yes.

21     Q.    Independent of a doctor?

22     A.   Independent meaning if the -- like the doctor
23  may not physically be in the room but the licenses are
24  attached, but they're allowed to make diagnoses.

25     Q.    Can a PA make a diagnosis without seeing the

**RYAN D. HERRINGTON, MD**

62

1  patient?

2      A.    Can you maybe clarify what you mean by

3  diagnosis.

4      **Q.    Arriving at a medical diagnosis of whatever the**

5  **malady is without seeing the patient.**

6      A.    Well, sometimes we're put in a position where

7  we have to come up with a diagnosis, and all we have is a

8  phone call, for example.  I'll give you an example.  When

9  I would take call in corrections, I would get phone calls

10  from nursing staff about patients that are in withdrawal,

11  and I would give orders for withdrawal management, and in

12  that situation I did make a diagnosis of alcohol

13  withdrawal or opiate withdrawal.

14      **Q.    Without ever seeing the patient?**

15      A.    Correct.

16      **Q.    Now, my question really wasn't whether you did**

17  **it.  My question was whether or not you are allowed to do**

18  **that under your license, to make a diagnosis without**

19  **seeing the patient?**

20      A.    In particular circumstances where you have

21  correct information, you can make a diagnosis without

22  seeing the patient.

23      **Q.    Does the state of Washington say that?**

24      A.    I don't know if that's codified in Revised Code

25  of Washington or not, but that's common and acceptable

**RYAN D. HERRINGTON, MD**

63

1  clinical practice.

2      Q.    Have you ever talked to the Oklahoma Medical

3  Board about that and what they would do to a doctor --

4  strike that.

5            Have you ever talked to the Oklahoma Medical

6  Board about their position on a physician making a medical

7  diagnosis without examining the patient?

8      A.    Can you give me the diagnosis that was made.

9      Q.    Any diagnosis.

10     A.    Including on-call physician for patients in

11  withdrawal and so forth?

12     Q.    As far as making a diagnosis.

13     A.    It can be acceptable under certain

14  circumstances.

15     Q.    You think that the Oklahoma Medical Board would

16  accept that?

17     A.    I don't know.

18     Q.    And do you have any knowledge of whether or not

19  a physician's assistant in the state of Oklahoma can make

20  a medical diagnosis, even attached to the license of a

21  doctor, without physically seeing the patient?

22     A.    It depends on clinical circumstances and the

23  diagnosis that is made.

24     Q.    Are you aware if the state of Oklahoma will

25  accept that?

64

1      A.    I don't know.

2      Q.    Are you aware if the state of Oklahoma will

3  accept a nurse practitioner formulating a diagnosis

4  without ever seeing the patient?

5      A.    I think it depends on circumstances, and it

6  depends on the diagnosis and the patient's condition.

7      Q.    So my question asked if you know if the state

8  of Oklahoma will accept that.  Do you know?

9      A.    I don't know.

10      Q.    Doctor, I'm going to hand you what I've marked

11  as Exhibit 39, which is a document that I found online

12  that has your picture and your name, I'm assuming, but I'm

13  going to ask you have you seen this before?

14      A.    Yes.

15      Q.    Why don't you just tell us for the record what

16  this is.

17      A.    This is a profile.

18      Q.    I'm sorry?

19      A.    This is a profile.

20      Q.    That's online concerning you?

21      A.    Correct.

22      Q.    It's telling the world that you're available as

23  an expert witness, which is correct, is it not?

24      A.    Correct.

25      Q.    And this is through SEAK, S-E-A-K, Inc.; is

**RYAN D. HERRINGTON, MD**

1   that correct?

2        A.    Correct.

3        Q.    So you've listed yourself as an expert through

4   SEAK?

5        A.    Correct.

6        Q.    Now, I would represent to you and you can see

7   in the upper left-hand corner the date that this was

8   printed where it says May 20, 2023.  Do you see that?

9        A.    Correct.

10       Q.    This is the way the current -- I don't know if

11   you say the word publication, but the current profile is

12   being listed online for you; is that true?

13       A.    I have not looked at this profile in some time.

14   We elected not to renew SEAK this year.  But I've done

15   more depositions than 18, so I would need to adjust that

16   up.

17       Q.    This says that you have done 18 in the previous

18   four years; but according to what you gave me, that's not

19   true, is it?  You gave me a list that has five on it, and

20   then you just gave me a few more for 2023.

21       A.    I've done approximately 30 now.  I didn't tally

22   them up.

23       Q.    Over the last four years?

24       A.    No.  That's over my career.

25       Q.    But just in the last four years, this says you

66

1    had done 18 in the last four years.  That's not exactly
2    accurate, is it?
3         A.    I don't know.  I'd have to get my list out and
4    tally it up.
5         Q.    Well, I tallied up your list when we just went
6    through it on your CV on Exhibit 38, and it showed me five
7    going back to 2018, and then you just told me about five
8    more in 2023.  I'm just trying to rectify it here.  That's
9    not 18, is it?
10        A.    Well, 18 was the number I tallied when I did
11   the profile.  Maybe I didn't see the last four years and I
12   accidentally included depositions that I had done before.
13   It might be a typographical error.
14        Q.    It might be a typographical error?
15        A.    Might be.  That happens.
16        Q.    Doctor, let's see here.  Let's go to your
17   report, which is, I think we said, Exhibit 36.
18        A.    We're going to go to the report now?
19        Q.    Let's do that.
20        A.    Okay.  So do you mind if I take a quick break?
21        Q.    Certainly.
22              (Recess from 11:05 a.m. to 11:14 a.m.).
23        Q.    (BY MR. SHADID)  Doctor, I'm directing your
24   attention to our Exhibit 36, which is a copy of your
25   initial report, March 22, 2022.  Just for our record, you

78

1   Ms. Spray, and I'm going on.  It says:  And opine whether

2   any deviations from prevailing standards of care took

3   place.

4           When you refer to prevailing standards of care,

5   what are you referring to?

6       A.    I am relying on my experience as a physician

7   and provider who's taken care of patients in similar

8   circumstances and in a similar practice environment, which

9   is a correctional facility.

10      Q.    What does practice environment have to do with

11  providing medical care?

12      A.    Well, it's a very important part of medical

13  care.  You -- if you do an appendectomy in OR versus

14  appendectomy on the beach, you're probably going to get a

15  better result in the OR.

16      Q.    In terms of the quality of medical care that is

17  to be provided to an inmate versus a person who is not an

18  inmate, is it supposed to be the same medical care?

19      A.    Yes.

20      Q.    So in terms of prevailing standards of care,

21  we're talking about the national standard of care or

22  whatever the situation is?

23      A.    I've always felt that human anatomy and

24  physiology was the same in, like, Kansas as it is in

25  Florida.  And I'm sorry, could you repeat your question.

79

1        Q.      Probably a bad question.  Do you agree that in
2    the United States we generally -- not generally, but that
3    we do deal with a national standard of care?
4        A.      So I was --
5        Q.      I'll rephrase it.  Do you know what the
6    standard of care for medical practitioners is in the state
7    of Oklahoma?
8        A.      I don't understand your question.
9        Q.      Do you know what the standard of care is in the
10   state of Oklahoma?
11       A.      Yes.
12       Q.      What is that?
13       A.      Well, the standard of care would be what a
14   reasonably prudent provider would do under similar
15   circumstances.  And I think what I was trying to get to
16   earlier was that would be substantially similar in
17   Oklahoma as it is in Washington.
18       Q.      I will refer to you the following words from
19   Title 76 of the Oklahoma Statute, section 20.1, which I
20   know my esteemed opposing counsel is extremely familiar
21   with, quote, The standard of care required of those
22   engaging in the practice of the healing arts within the
23   State of Oklahoma shall be measured by national standards,
24   close quote.
25              In assessing the medical care provided to

**RYAN D. HERRINGTON, MD**

80

1    Ms. Spray, were you doing it under national standards?

2        A.    Well, yes.

3        Q.    Okay.  I need to jump ahead to page 5 real

4    quick, and we'll come back in a minute.

5        A.    We can do whatever you like.

6        Q.    On page 5 is the list of documents reviewed, or

7    at least that's where it begins, and then it goes on, I

8    believe, to the next page.  These are documents, I'm

9    assuming but I'm going to ask, you put on a thumb drive?

10   You said you received documents on a thumb drive?

11       A.    Yes.  I have the thumb drive here somewhere.

12   But yes, that's my recollection.

13       Q.    Now, back in the early part of 2022, obviously

14   no depositions had been taken at that time, I don't

15   believe, and no depositions were listed here, of course.

16   If you will turn, please, to your addendum which I

17   think -- these may go backwards and we may put them out of

18   order.  I think Number 35 is your addendum dated

19   February 9, 2023.

20             First, you recognize that as the addendum?

21       A.    Yes.

22       Q.    I don't know if that's the right word to use.

23   Supplemental -- well, it says it in it, addendum.  Okay.

24   On the second page of the addendum, it says Additional

25   Reviewed Records, and the things that you were provided at