RYAN D. HERRINGTON, MD

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF OKLAHOMA

---

WILLIAM RAY SPRAY, JR., and )
RHONDA JEAN SPRAY, Individually )
and as Personal Representatives )
of the Estate of SINDI LUCILLE )
SPRAY, Deceased, )
                                  )
            Plaintiffs, )
                                  )
    vs. )   NO. CIV-20-1252-C
                                  )
BOARD OF COUNTY COMMISSIONERS )
OF OKLAHOMA COUNTY, in its )
Official Capacity as Governing )
Body of the County of Oklahoma )
County, )
                                  )
            Defendant. )
                                  )

---

DEPOSITION UPON ORAL EXAMINATION OF

RYAN D. HERRINGTON, M.D.

May 23, 2023
Olympia, Washington
Pages 1 through 140

---

Reported by Karyn Kirouac, CCR #2471

PLAINTIFF'S EXHIBIT 28
CIV-20-1252-R

RYAN D. HERRINGTON, MD

1  clinical practice.
2      Q.    Have you ever talked to the Oklahoma Medical
3  Board about that and what they would do to a doctor --
4  strike that.
5            Have you ever talked to the Oklahoma Medical
6  Board about their position on a physician making a medical
7  diagnosis without examining the patient?
8      A.    Can you give me the diagnosis that was made.
9      Q.    Any diagnosis.
10     A.    Including on-call physician for patients in
11 withdrawal and so forth?
12     Q.    As far as making a diagnosis.
13     A.    It can be acceptable under certain
14 circumstances.
15     Q.    You think that the Oklahoma Medical Board would
16 accept that?
17     A.    I don't know.
18     Q.    And do you have any knowledge of whether or not
19 a physician's assistant in the state of Oklahoma can make
20 a medical diagnosis, even attached to the license of a
21 doctor, without physically seeing the patient?
22     A.    It depends on clinical circumstances and the
23 diagnosis that is made.
24     Q.    Are you aware if the state of Oklahoma will
25 accept that?

Page 63

RYAN D. HERRINGTON, MD

1   A.   I don't know.
2   Q.   Are you aware if the state of Oklahoma will
3   accept a nurse practitioner formulating a diagnosis
4   without ever seeing the patient?
5   A.   I think it depends on circumstances, and it
6   depends on the diagnosis and the patient's condition.
7   Q.   So my question asked if you know if the state
8   of Oklahoma will accept that. Do you know?
9   A.   I don't know.
10  Q.   Doctor, I'm going to hand you what I've marked
11  as Exhibit 39, which is a document that I found online
12  that has your picture and your name, I'm assuming, but I'm
13  going to ask you have you seen this before?
14  A.   Yes.
15  Q.   Why don't you just tell us for the record what
16  this is.
17  A.   This is a profile.
18  Q.   I'm sorry?
19  A.   This is a profile.
20  Q.   That's online concerning you?
21  A.   Correct.
22  Q.   It's telling the world that you're available as
23  an expert witness, which is correct, is it not?
24  A.   Correct.
25  Q.   And this is through SEAK, S-E-A-K, Inc.; is

RYAN D. HERRINGTON, MD

```
 1   on the list?
 2        Q.    Let's see.
 3              MS. REMILLARD:  I have a copy here.
 4        Q.    (BY MR. SHADID)  It's in the little book.  I
 5   think it's number -- no.  I believe it's number 7.  I'm
 6   just asking if that's what you were referring to.
 7        A.    Yes.
 8        Q.    Okay.  On number -- down at line 34, the
 9   documents reviewed, it says Turn Key Case Review.  I think
10   I know which document you're referring to.  I'll pull it
11   up to be sure.  It was number 25.  Exhibit 25 is labeled
12   Sentinel Event Review.  Is that what you're referring to
13   as being the Turn Key case review?
14        A.    Yes.
15        Q.    Okay.  I just want to be sure that we're
16   talking about the same thing, because we will talk about
17   it a little bit more.
18        A.    Can we do just a quick few minutes?
19        Q.    Sure.  Sure.
20              (Recess from 11:57 a.m. to 12:04 p.m.).
21        Q.    (BY MR. SHADID)  Doctor, on page 6 of your
22   report, the top of the page, it still has things that are
23   listed that you reviewed or at least -- yeah, that says
24   you reviewed.  Line 2 talks about phone call recordings by
25   Ms. Spray.  Were they relevant to your opinion in any way?
```

Page 88

RYAN D. HERRINGTON, MD

1   A.   Ms. Spray called her grandmother.  What I
2  remember from that is the patients that I have seen that
3  have actively perforated an ulcer are not comfortable
4  enough to be on the phone, if that makes sense.
5   Q.   Were you suggesting that you believe she did
6  not have a perforated ulcer at that time?
7   A.   No.  My belief is that she perforated her ulcer
8  prior to being booked.  That's what my belief is.  And
9  it's an unusual presentation for that diagnosis.
10  Q.   I'm trying to correlate that with you said you
11 usually don't feel comfortable being on the phone.
12  A.   It's not they're uncomfortable being on the
13 phone.  If you've seen a patient with an acute surgical
14 abdomen, it's an impressive thing to see clinically, and
15 the patients are profoundly uncomfortable.
16       In fact, oftentimes we'll ask them about the
17 car ride on the way to the hospital:  Did the bumps on the
18 road bother your abdomen?
19       And so the point I'm trying to make is those
20 patients are usually very uncomfortable.  And when I heard
21 her voice, it sounded like a conversation that I would
22 hear for someone who's not at that level of discomfort, is
23 what I tried to say.
24  Q.   You believe that she was -- that her duodenal
25 was perforated before she was booked in, but the phone --

Page 89

RYAN D. HERRINGTON, MD

1   the conversations you heard were not really consistent
2   with what you would normally expect in terms of the way
3   she sounded as far as being in agony or pain?
4        A.    From the surgical -- from an acute surgical
5   abdomen, yes.
6        Q.    Now, while we're on that subject, why do you
7   think that the perforation happened before she was booked
8   in?
9        A.    The reason I think that is I didn't see a
10  presentation of an acute surgical abdomen while she was at
11  Oklahoma Detention Center.  I never saw any documentation
12  that was suggestive of that development.
13       Q.    What you call an acute abdomen?
14       A.    Correct.  So that's what I was looking for.
15       Q.    What symptoms would you be looking for?
16       A.    So I'm looking for somebody who's very
17  uncomfortable, particularly with their abdominal
18  examination.  When you put your hands on these patients
19  and you press inwards and then you pull your hands away
20  kind of quickly, that maneuver is enough to irritate the
21  peritoneum, and the patients complain of pain.
22       Q.    What else would you be looking for?
23       A.    Well, I mean you would take a history first.
24       Q.    For what you call an acute abdomen, you would
25  take --

Page 90

RYAN D. HERRINGTON, MD

1    A.    Vital signs; you would ask for what medicines
2  they take.
3    Q.    Anything else, Doctor?
4    A.    Medicines, when the pain started, what makes it
5  better or worse, what you've done for it before, have you
6  had this before, what operations have you had, are you
7  passing gas and stool.
8          There's a whole host of questions you can go
9  through, but what I'm looking for is somebody that
10 presents with significant abdominal pain and an
11 examination that's abnormal.  That's kind of what I'm
12 looking for.  And because I didn't see that in Ms. Spray's
13 file, I don't think she had a surgical abdomen.  And then
14 1,400 --
15   Q.    Surgical or acute?
16   A.    Same.  I use the term interchangeably.
17   Q.    You didn't see what?
18   A.    So I didn't see an acute abdomen presentation
19 in her file, and that impacted my opinion very
20 substantially.
21         And then her postmortem finding of 1,400 MLs, I
22 saw that as a very large amount of volume of fluid, and
23 the reference was made to seepage.  So I didn't think that
24 the fluid was leaving the intestinal system quickly.  So I
25 took the absence of an acute abdomen, and I took this

Page 91

RYAN D. HERRINGTON, MD

1   seepage language that the medical examiner used, and
2   determined that on a more-likely-than-not basis that 1,400
3   milliliters had to accumulate slowly over time.
4       Q.   I should have asked you this earlier: You're
5   not trying to blame the pathologist, right?
6       A.   I'm not a pathologist, but I'm a very good
7   primary care doctor and a very --
8       Q.   A very good primary care doctor that's not
9   board certified, correct?
10      A.   No. I'm boarded in preventive medicine in
11  addition --
12      Q.   In primary care.
13      A.   I'm not boarded in primary care. So I don't
14  feel that I was outside the scope of my expertise in
15  saying what I just said.
16      Q.   On the symptoms that you just referred to
17  regarding acute abdomen, you said uncomfortable with
18  abdominal examination. You would do palpations?
19      A.   I would, yes.
20      Q.   That never happened to Sindi Spray, did it?
21      A.   I did not see a provider palpate her abdomen,
22  that is correct.
23      Q.   Are you able to tell us what the causes of a
24  duodenal ulcer is?
25      A.   We usually think of infection with a

Page 92

RYAN D. HERRINGTON, MD

1  rectum, can you take it out. So we don't do that. We
2  don't do that kind of exam.
3          Another example might be a patient who's
4  actively seizing for no reason after hours, and I get a
5  phone call. I'm not going to delay definitive treatment
6  so that I can drive to the prison and do an examination.
7     Q.   You're not going to send them to the ER?
8     A.   No, I'm going to send them to the ER.
9     Q.   You're not?
10    A.   I would.
11    Q.   You would? That's different.
12    A.   No, that was your question. You asked me if
13 there was situations where you don't need to do an exam.
14 And when you can arrive at an appropriate treatment plan
15 for your patient that's in your patient's best
16 interests --
17    Q.   Doctor, when you send somebody to the ER,
18 somebody is doing an exam, are they not?
19    A.   They would do an exam at the ER.
20    Q.   Correct. I asked you whether there's any
21 peer-reviewed materials that say that it's okay to not do
22 an examination.
23    A.   I think you could find something somewhere that
24 is very consistent with what I just said.
25    Q.   Have you found anything that says it's okay to

Page 98

RYAN D. HERRINGTON, MD

1   not examine patients?
2       A.   I've never looked, because I've never had to.
3       Q.   And outside of an emergency situation -- when
4   you have an emergency situation, you send them to the ER,
5   don't you?
6       A.   I do.
7       Q.   Nobody sent Sindi Spray to the ER, did they?
8       A.   No.
9       Q.   And on December 16th, at least by noon or
10  thereabouts, she was complaining of severe abdominal pain,
11  burning, wasn't able to stand up on her own, had to be
12  dragged back to her bunk, and she had previously had some
13  up and downs on the heart rate.  As you've said, she was
14  clearly tachycardic.  And no doctor ever saw her.  That is
15  true, is it not?
16      A.   No doctor saw her, that's true.  I'd like to
17  ask if you could show me where you saw abdominal pain.
18      Q.   Okay.  You're the reviewing expert.  You didn't
19  see that in this chart?
20      A.   I didn't.
21      Q.   Well, let's look -- it's on Exhibit 17.  Let's
22  start there.
23           MS. REMILLARD:  Can you refer to the Bates
24  number, because I don't have your exhibit.
25           MR. SHADID:  Oh, I'm sorry.

Page 99

RYAN D. HERRINGTON, MD

1   see a surgical abdomen.
2       Q.   Whether you see a specific thing or not, when
3   complaints happen should the patient's complaints be
4   listened to?
5       A.   Yes.
6       Q.   And when she told Ginger Vann and Ginger Vann
7   reported that she was having stomach pain, that she was
8   having burning in her chest or abdomen, couldn't even
9   walk, should that have been paid attention to?
10      A.   Yes.
11      Q.   And it wasn't, was it?
12      A.   So the reason I think that the Turn Key folks
13  and the county, I think that their care of this lady was
14  not a cause or an explanation for her passing, is that
15  they recognized that she had opiate withdrawal and they
16  monitored her for that and they gave her appropriate
17  treatment for that.
18           It's unlikely that she would present with a
19  second problem at the same time that didn't present in the
20  usual way.  So my opinion is that Ms. Spray had two
21  problems:  One that presented in the usual way that was
22  recognized and monitored and treated; the second one
23  didn't present in the usual way, and she didn't have a
24  history of peptic ulcer disease anyway.
25           So I didn't find evidence that that condition

Page 103

RYAN D. HERRINGTON, MD

1   which is ultimately what killed her, I didn't find
2   evidence in my review that there was enough information or
3   clinical suspicion that would warrant somebody thinking
4   about that diagnosis.
5       Q.   So back to my question:  When she complained of
6   abdominal pain, burning, and not being able to stand up,
7   and it was reported to nurse Hadden, she didn't do
8   anything, did she?
9       A.   I don't -- I didn't see that she did anything.
10      Q.   She did not respond to those complaints, did
11  she?
12      A.   I don't -- I don't remember.
13      Q.   She said:  Well, I saw her earlier this morning
14  and she's fine, something to that effect?
15      A.   That's what I remember.
16      Q.   And then nurse Hadden post-death wrote a chart
17  entry.  Did you see that?
18      A.   I did, but I'd like to see it.
19      Q.   I'll show it to you.  On page -- actually it
20  appears more than once, but on page 75, that's one of the
21  entries, and it's a few other places.  Let's see.  To be
22  more precise, it's on 106.
23      A.   Okay.
24      Q.   It's under the heading of chart notes, which is
25  why I was asking you earlier what you consider to be the

Page 104

RYAN D. HERRINGTON, MD

1  Board, then.
2      A.   Sure.
3      Q.   Because I'm sure you have no idea how many
4  doctors I've defended who didn't see patients.
5      A.   Mr. Shadid, I'm very confident in the opinions
6  I've given in this report.
7      Q.   I understand you're confident.  A nurse can't
8  make a diagnosis, can they?
9      A.   That's correct.
10          So one thing we might be looking at here is the
11 standard of care doesn't require that a patient see a
12 provider right away once they enter the correctional
13 facility.
14     Q.   Doctor, I have a limited amount of time.  I've
15 got to be out of here in an hour.  My question is who made
16 a working diagnosis?
17          MR. SHADID:  I want this time stamped.  Can you
18 do that?
19          (The time noted was 1:13 p.m.).
20     Q.   (BY MR. SHADID)  Go ahead, Doctor.
21     A.   The working diagnosis for this case would have
22 been made by the -- I think she was a nurse practitioner
23 who received a phone call about Ms. Spray the evening of
24 the 14th of December.
25     Q.   Where are you looking, Doctor?

Page 112

RYAN D. HERRINGTON, MD

1    A.    I am looking on page 9 of my report.
2    Q.    Separate from your report, where in the records
3  are you referring to where anybody made a diagnosis?
4    A.    Well, I don't think it appears in the chart
5  yet, because she expired.  Had she been seen for her
6  history and physical, somebody would have diagnosed opioid
7  withdrawal.
8    Q.    Somebody would have done it, but it hadn't
9  happened.  And you just put down here that she was -- you
10 said, at line 13 on page 5, that they had every reason to
11 be confident in their working diagnosis, and I want to
12 know what that working diagnosis was.
13   A.    So she came in and on her intake screening she
14 said she took heroin, one and a half grams a day, and she
15 gets put on a monitoring system.
16   Q.    Got all that.  I just want to know who -- don't
17 fill up the record with other stuff.  The question's very
18 simple.  What provider made a working diagnosis of
19 anything?
20   A.    So it would have been the provider that
21 answered the phone call the evening of the 14th.
22   Q.    Show me.
23   A.    Well, I don't think she wrote a note on it.
24   Q.    Well, then you don't know that it happened if
25 she didn't write a note.

Page 113

RYAN D. HERRINGTON, MD

1     A.    No, but on a more-likely-than-not basis, she
2 did because I've received these exact same phone calls.
3 I've made the exact same working diagnosis.
4     Q.    You're speculating that she did?
5     A.    I don't think I'm speculating. I think it's
6 more than 50 percent.
7     Q.    You don't see anything in the record where
8 there is a diagnosis of anything, do you?
9     A.    I would have if she had lived to her medical --
10 to her intake physical, history and physical.
11     Q.    Let's go back to the question. You don't see
12 anything in the record that shows that anybody made a
13 diagnosis, do you?
14     A.    There's no chart note that says diagnosis,
15 opioid use disorder, opioid withdrawal.
16     Q.    Or anything else, correct?
17     A.    I don't see a note that says that.
18     Q.    Why do you think, as you stated at page 4 of
19 your opinion, that the theme of the case relates to how
20 the patients were processed?
21     A.    Where are you now?
22     Q.    On page 4 of your opinion.
23     A.    Of the original report?
24     Q.    Yes, sir.
25     A.    That's 36?

Page 114

```
 1    Q.    How often are detox checks supposed to happen?
 2    A.    It depends on the severity of the withdrawal.
 3    Q.    How often should detox checks have happened for
 4  Sindi Spray?
 5    A.    She had twice a day.  And your question is how
 6  often should she have --
 7    Q.    How often should they have them?
 8    A.    So I don't think she was under-monitored.  I
 9  know that's not exactly your question.
10    Q.    No, my question is how often should it have
11  happened?
12    A.    You could have ordered twice a day, you could
13  have ordered three times a day to start, and sort of see
14  how she trended and adjust accordingly.
15    Q.    Is 19 hours apart okay?
16    A.    That's long.
17    Q.    Is 22 hours apart okay?
18    A.    That's long.
19    Q.    What about 16 hours?
20    A.    That's long.
21    Q.    If a patient inmate requests medical care, is
22  it okay for a nurse to refuse it?
23    A.    No.
24    Q.    Is it okay for a nurse to not complete a set of
25  vital signs when assessing a patient for presumed opioid
```

Page 121

RYAN D. HERRINGTON, MD

```
 1   withdrawal when the complaints now exist -- now include
 2   shortness of breath?
 3        A.    No.   There should be a set of vital signs.
 4        Q.    When a complaint is made to the director of
 5   nursing regarding an inmate's patient care, is it okay for
 6   the director of nursing to not pass that on to the health
 7   services administrator?
 8             MS. REMILLARD:   Object to form.
 9             THE WITNESS:   I don't know that a nursing
10   director would have to pass something on to the health
11   services administrator.   If that's a clinical patient
12   encounter, I think you treat that as a patient encounter
13   and take care of your patient.
14        Q.    (BY MR. SHADID)  If a staff member complains --
15   I'm talking about a medical staff member complains to the
16   director of nursing about something that another staff
17   member did or did not do pertaining to patient care, is
18   that something that the DON -- is it okay for the DON to
19   not pass that on to the health services administrator?
20        A.    I think it depends on what it is.
21        Q.    If the medical technician is passing out meds
22   and sees Sindi Spray not being able to walk, and having to
23   have aid in scooting her back to her bunk, and complaining
24   of abdominal pain and burning, if she reports it to the
25   nurse, in this case nurse Hadden, should nurse Hadden
```

Page 122

RYAN D. HERRINGTON, MD

1  simply refuse to go see her?
2      A.   You're not allowed to just refuse to see
3  someone.  You're obligated to make sure that that
4  patient's had an assessment.  So depending on
5  circumstances, the patient may have just had an
6  assessment, or they may have a -- an assessment scheduled
7  like in the next few hours.  So to answer your question,
8  you can't just ignore a patient.
9      Q.   You didn't see anything -- and I appreciate
10 that.  You didn't see anything for a scheduled assessment
11 in the next few hours, did you?
12     A.   I did not.  But what I was trying to articulate
13 is that you can't ignore a patient.  Your obligation is to
14 make sure that that patient has been assessed and has a
15 treatment plan in place.
16     Q.   Did you see the videos of approximately 9:00
17 a.m. or 9:20 a.m. on December 16th showing that Sindi
18 Spray was walking to a breathing treatment that morning?
19     A.   The video I remember, and I think this is the
20 one that has been mentioned, I saw where she slid down the
21 wall.
22     Q.   I'm talking about one before that.
23     A.   I don't remember that one offhand.
24     Q.   Okay.  You saw the one where she slid down the
25 wall?

Page 123

```
 1   the cell mate Kim Darling gave to local news media?
 2        A.    I want to say that I remember pieces of that.
 3   I'm afraid I don't remember much of it.
 4        Q.    I just wondered if you reviewed it.
 5        A.    I think so.  I don't exactly remember.
 6        Q.    Did it affect any of your opinions?
 7        A.    No.
 8        Q.    You noted at page 6 of your report on the
 9   Pottawatomie County Jail that there was no obvious -- or
10   there was no reference to any obvious pain or any medical
11   problems at that time on December 12th.  That's your
12   belief, right?
13        A.    That's what I had documented.
14        Q.    On page 7 under the heading of Oklahoma County
15   Jail, line 8 says December 12, 2018, pre-booking
16   screening.  Where did you get that from, since she wasn't
17   there on December 12th?
18              Doctor, I don't know if we have enough time for
19   you to go through all that.  Would you at least
20   acknowledge she wasn't there on December 12th?
21        A.    She was -- she came on December 13.
22        Q.    Okay.  Doctor, on page 8 of your report,
23   there's an excerpt from the chart that you put there.
24        A.    Page 8, sir?
25        Q.    Yes.  Toward the bottom, between the 10 and the
```