```
                IN THE UNITED STATES DISTRICT COURT
                  FOR THE WESTERN DISTRICT OF OKLAHOMA

ELIZABETH ANN CHRISMAN, as         )
Special Administrator of the       )
Estate of Charlton Cash Chrisman,  )
Deceased and Individually as       )
Surviving Mother and on Behalf     )
of the Heirs of Charlton Cash      )
Chrisman, Deceased,                )
                                   )
          Plaintiff(s),            )
                                   )
-vs-                               ) Case No. CIV-17-1309-D
                                   )
BOARD OF COUNTY COMMISSIONERS      )
OF OKLAHOMA COUNTY, In its         )
Official Capacity as Governing     )
Body of the County of Oklahoma     )
County, et al.,                    )
                                   )
          Defendant(s).            )


          DEPOSITION OF PAUL DAVID "P.D." TAYLOR

          TAKEN ON BEHALF OF THE PLAINTIFF(S)

                IN OKLAHOMA CITY, OKLAHOMA

                   ON MARCH 10, 2020


_____
          REPORTED BY: LESLIE A. FOSTER, RPR
```

1

Dodson Court Reporting & Legal Video
http://www.dodsonreporting.net



PLAINTIFF'S EXHIBIT 42  CIV-20-1252-R

# PAUL TAYLOR

1  (Mr. Hendrickson not present.)
2  WHEREUPON,
3  PAUL DAVID "P.D." TAYLOR,
4  of lawful age, being first duly sworn, deposes and says
5  in reply to the questions propounded as follows:
6  EXAMINATION
7  BY MR. SHADID:
8   Q   Sheriff, would you state your full name for the
9  record.
10  A   Paul David Taylor.
11  Q   You are the sheriff of Oklahoma County.  Right?
12  A   Yes, sir.
13  Q   Sheriff, have you ever had a deposition taken
14  of yourself before?
15  A   Yes, I have.
16  Q   You know the general protocols that we go
17  through, but I like to caution every witness, as I'm
18  about to do.  If I ask questions that are confusing to
19  you, if it comes out of my mouth like a mishmash, please
20  stop me; please tell me to repeat the question; please
21  make sure you understand the question before you answer
22  it.  Okay?
23  A   Okay.
24  Q   You've testified in court many times, I assume.
25  Is that correct?

Dodson Court Reporting & Legal Video
http://www.dodsonreporting.net

But it had to be outside medical service.  I don't think the jail was capable of handling that.

**Q** Armor Correctional Health Services or something like that was a provider of medical attention or medical care during the time frame that Cash Chrisman was there.  Correct?  2017?

**A** Yes.

**Q** Armor left in -- was it 2019?  Or you just tell me.

**A** They left after I became interim sheriff and sheriff.

**Q** Uh-huh.

**A** We now use Turnkey.

**Q** Was Armor there up to the beginning of '19 or they left before '19?

**A** I'm not sure when they left.

**Q** There was a lawsuit involving Armor and the county.  Do you remember that?

**A** Yes, sir.

**Q** Were you involved as a witness in that case?

**A** No, sir.

**Q** Were you involved in that case at all?

**A** No, sir.

**Q** Were you aware of the allegations about nonpayment?

51

A    I was aware of the allegations.

Q    And were you aware -- pardon me -- that the court determined that Armor was owed about $3.4 million or something like that?

A    Yes, sir.

Q    Are you aware that it was paid by the county --

A    Yes, sir.

Q    -- ultimately?

Do you know -- or strike that.

Have you heard from any source why Armor was not paid that money along the way? Sheriff Whetsel ever tell you? Did anybody ever tell you?

A    To the best of my knowledge, Sheriff Whetsel was in a position of paying Armor or meeting payroll, is what I was told.

Q    Wasn't Sheriff --

A    And he --

Q    Go ahead. I'm sorry.

A    He chose to meet payroll for a couple of months rather than pay Armor.

Q    And when you say "meet payroll," does that mean meet payroll for the jail or the entire sheriff's department?

A    The entire sheriff's department, all the employees.

PAUL TAYLOR

1  Q    Does that include the jail?
2  A    Yes.
3  Q    Again, I'm not being facetious about it.  I
4  just didn't know if the jail is part of -- when you say
5  "pay all the employees," if that's part of the -- the
6  whole thing as part of the sheriff's department.  Is that
7  correct?
8  A    Yes.
9  Q    Okay.  Now, you said that would be for just
10 a -- that was for a couple of months that you believe he
11 made that decision to pay employees instead of Armor?
12 A    I don't know the length of time, but --
13 Q    Is that what he told you?
14 A    I believe it was for several months, but I
15 don't know that for sure.
16 Q    You believe it was for several months?
17 A    (Witness nodding head.)
18 Q    Is that a "yes" for the record?
19 A    Yes.  Sorry.
20 Q    Is the information that you obtained or learned
21 regarding the situation with Armor, is that information
22 that came from Sheriff Whetsel to you?
23 A    Probably hearsay.
24 Q    But did it --
25 A    I didn't participate in any meetings or

53

1 discussions or settlements or anything.
2     Q    But the information that you received, did it
3 come from Sheriff Whetsel?
4     A    I couldn't tell you that.
5     Q    Did any of it come from Sheriff Whetsel?
6     A    I couldn't tell you that.
7     Q    If Sheriff Whetsel -- strike that.
8         Was it your understanding that if money went to
9 pay employees as opposed to Armor, was it your
10 understanding that for that month, if you took any
11 particular month, that Armor was paid zero or was Armor
12 just paid a short amount?
13     A    I don't know.
14     MR. WOOD:  Object to the form.
15     Q    (BY MR. SHADID)  Do you understand --
16     MR. WOOD:  Go ahead.
17     Q    (BY MR. SHADID)  -- what I'm asking?
18     A    Yes.
19     Q    What was your understanding?
20     A    I -- I don't know.  I was not ever any part of
21 a budgetary meeting, discussion, or anything.
22     Q    During the time that Armor was not being
23 paid -- just let me ask you this.  What time frame did
24 that cover?  Do you know which years?
25     A    No, sir.

PAUL TAYLOR

1  Q     Do you think that Armor would have been real
2  happy about providing medical care if they weren't
3  getting paid?
4        MR. WOOD:  Object to the form.
5        MR. FRISBY:  Object to the form.
6  Q     (BY MR. SHADID)  You may now answer.
7  A     I don't know what their feelings were on --
8  it's my understanding they continued to provide service.
9  Q     Do you think that anybody in Armor's position
10 would be real happy about providing services if they were
11 not getting paid?
12       MR. WOOD:  Object to the form.
13       MR. FRISBY:  Same objection.
14 Q     (BY MR. SHADID)  You may now answer.
15 A     I can't answer for Armor.
16 Q     Would you be real happy about providing
17 services if you weren't getting paid?
18 A     No, I would not.
19 Q     And do you think that your detention officers
20 would be real happy about providing services if they were
21 not getting paid?
22       MR. WOOD:  Object to the form.
23 A     They would not be happy.
24 Q     (BY MR. SHADID)  They would not be happy.
25       In this article that you have in front of you,

55

```
 1  Exhibit 88, it talks specifically about an inmate named
 2  Aaron Spottedcorn, S-P-O-T-T-E-D-C-O-R-N.  And apparently
 3  he had hung himself.  This happened just -- it looks like
 4  a couple of days -- well, it says April 9th.  I'm sorry.
 5  Couple weeks before the Cash Chrisman matter.  Do you
 6  know if this person was on suicide watch at the time?
 7       A    I don't know.
 8       Q    This article on the second page in the second
 9  column refers -- toward the bottom of that second
10  column -- to the report from the United States Department
11  of Justice that was issued in 2008.  Are you familiar
12  with that report, Sheriff?
13       A    I -- yes.
14       Q    I mean, you know what I'm talking about?
15       A    Yes, I know what you're talking about.
16       Q    During the time that -- subsequent to that
17  report when it came out in 2008, were you involved at all
18  in implementing the recommendations or requirements
19  actually under that report?
20       A    No, sir.
21       Q    Did you become knowledgeable at the time of
22  what was in the report?
23       A    I would say yes.
24       Q    Are you aware of what steps, if anything, the
25  Oklahoma County Sheriff's Office did in response to the
```

**Q** Were there any further recommendations?

**A** No. They -- they even expressed that they were -- they gave me the opinion that they were ready to release us, but because of the trust that was going to take over, they were going to continue overseeing the jail until they saw what direction the trust was going to go with the jail.

**Q** So DOJ has not issued a release at this time?

**A** No. And it's -- and they may not. They've been there before and never issued a written report.

**Q** Did they issue a written report regarding their inspection of October, November of 2018?

**A** Not yet. Hopefully, we will get one.

**Q** Is the trust still scheduled to take over in mid-April?

**A** I don't know when they're going to take over.

**Q** Okay. When there were problems in paying Armor, did Sheriff Whetsel or anybody go to the county commissioners and talk to the county commissioners about the need for further funding?

**A** I'm sure he did.

**Q** Are you aware of any responses from the county commissioners regarding requests for funding?

**A** No, sir.

**Q** And so I'm clear on this, funding does go

through the county commissioners, does it not?

**A**  Yes. And the budget board.

**Q**  Okay. But the -- the decision-makers are the county commissioners -- is that correct -- regarding funding?

**A**  They have a part to play, but I think the budget board has a bigger roll.

**Q**  Who makes the final decision about either, yes, we're going to pay a hundred thousand dollars for something or, no, we're not?

**A**  I believe that's the county commissioners.

**Q**  And if somebody was going to make the final decision about whether we're going to put another million dollars into the jail or the sheriff's office, that decision would come from the county commissioners. Is that correct, sir?

**A**  Well, there -- there again, the budget board would have a part in that.

**Q**  I'm talking about the final decision.

**A**  Well, the -- the three county commissioners has the final decision and approves everything.

**Q**  And that's what I want to be sure about, sir. Are you aware of the county commissioners of Oklahoma County ever addressing the shortfall of funds to either pay Armor or pay the sheriff's department? Are you aware

59

1  of anything they did or didn't -- or did not do, either
2  way?
3      A    I wasn't privy to any of that.
4      Q    Well, apparently, they did not provide funds
5  until the judgment was entered against the county.  Is
6  that your understanding?
7      A    I would agree with that.
8      Q    The Department of Justice, according to this
9  article -- and we've got the Department of Justice report
10 if we needed to do it, but I'm going to paraphrase.
11          The Department of Justice, in their 2008
12 findings, basically determined -- I believe the words
13 were that supervision of detainees was virtually
14 nonexistent.  Do you have any -- forget it.  Strike all
15 that.
16          MR. SHADID:  Let's go off the record a minute.
17                  (Off the record at 11:33 A.M.)
18                  (On the record at 11:34 A.M.)
19     Q    (BY MR. SHADID) Looking at this same article,
20 Sheriff, on the second page toward the top, this middle
21 column, there's reference -- I'm sorry.  It's on the
22 third page.  I apologize.  There's reference or
23 discussion here about a local task force.  It starts down
24 here at the bottom of the second column and goes up to
25 the top of the third column.  A local task force headed

1  up by local businessmen that were looking at the jail and
2  headed by Clay Bennett, and it refers to the task force.
3              It says "The task force called on local and
4  state leaders to address the issues that were driving
5  overcrowding."  It refers to mental health, addiction in
6  particular.  It says "mental health and addiction."
7              At the time of the Cash Chrisman incident in
8  April of 2017, was there anything in particular to your
9  knowledge, any programs -- and that may be a bad word.
10 Any specific type of care that was being rendered to
11 mental health inmates, or I should say inmates with
12 mental health issues?
13     A    The -- again, I can't -- yes.  That committee
14 with Clay Bennett started about four and a half years ago
15 with the intent of identify permanent funding to help
16 fund the jail or build a new jail.  That appears not to
17 have happened.
18              MR. WOOD:  Well, he asked you a more specific
19 question.  He's just asking you about the time of the
20 Chrisman incident, were there programs in place to
21 address mental health issues.  Is that correct?
22     Q    (BY MR. SHADID)  And that's really what I was
23 getting at.  And I appreciate your commentary on it,
24 Sheriff.  But are you aware if there were any specific
25 methods of treating or caring for inmates who had mental

 1    Q    Do you receive any yourself personally?
 2    A    No.
 3    Q    Do you attend conferences as a sheriff
 4  regarding subjects of jail policies, regarding subjects
 5  of use of force, things of that nature?
 6    A    I have not -- since I've been with the sheriff
 7  office, I have not attended any conferences or seminars.
 8  Sheriff Whetsel went to them all the time, but I never
 9  attended any of them with him.
10    Q    But since you've been the acting sheriff and
11  then full -- full-time sheriff, you have not yourself?
12    A    We've basically cut out all travel for
13  financial reasons --
14    Q    Financial reasons?
15    A    -- to save money.
16    Q    We've had discussion about just generally, I
17  guess, what we'd call low staffing or being understaffed
18  during the course of our discussions in this case.  And
19  that would be true, is it not?  There's been
20  understaffing at the jail for some time.  Would that be
21  true?
22    A    In my opinion, we are understaffed.
23    Q    Would it be correct to say that during the time
24  of the Cash Chrisman incident, and even through the
25  present time, that most of the jail detention officers

1  are being paid somewhere above the 11- or $12 an hour per
2  range?
3      A    I believe it's a little bit higher than that.
4  It's -- it's hard to hire people to work in the jail
5  because so many people are eliminated from the
6  application.
7      Q    And there's a lot of turnover, is there not?
8      A    There is turnover.
9      Q    The truth is that whether you call it 11- or
10 12- or $13 an hour, it doesn't keep people there very
11 long, does it?
12     A    It's -- we lose a lot of people to higher pay
13 jobs.
14     Q    As sheriff, are you involved in making requests
15 for funding for the sheriff's department of the jail?
16     A    Yes, I'm part of that.
17     Q    Tell us generally how that works, what the
18 process is to request funding.
19     A    Well, we have to -- we have to put together a
20 proposed budget.  Last year for the first time, we
21 actually put together a budget for the jail and a
22 separate budget for law enforcement.  First time ever.
23 Because of the upcoming trust.  It's always been one
24 joint deal.
25     Q    Yes, sir.

124

Dodson Court Reporting & Legal Video
http://www.dodsonreporting.net

A   The budget board is all of the elected officials. They -- they -- they play a big role in the budgets -- in approving the budgets.

Q   The county commissioners play a big role?

A   I -- I apologize for not knowing more, but --

Q   No. I'm just saying when you --

A   -- the budget board is more responsible when it comes to -- the three commissioners are part of the budget board. They each have a vote.

Part of my problem when I was named the interim sheriff, the district attorney made a ruling that I couldn't vote on the budget board for 10 months. That was not a positive thing for the sheriff's office.

Q   Is the sheriff, as an officer, part of the budget board?

A   Yes. But the district attorney ruled that you -- I had to be an elected official. Being an interim, I could not vote. And it was unfortunate.

Q   Is the jail at full staff right now?

A   This -- this fiscal year we were authorized and was given money to pay for 420 people to work in the jail. We have less than that. We can't -- we can't hire people.

Q   I'm told from other representatives of your office that the target's about 600 people. Does that

```
 1  sound right?
 2      A    Well, Department of Justice recommends
 3  approximately 200 more employees than the 420.
 4      Q    Okay.
 5      A    Because of the design of the building.
 6      Q    Okay.  Little over 600?
 7      A    Yes.
 8      Q    But that's not -- that's not the way it is, is
 9  it?
10      A    Well, this past -- the current fiscal year
11  we're in now, they funded 420 employees.  We're probably
12  at about 340, 350.
13      Q    That's not good, is it?
14      A    We do everything humanly possible to hire
15  people.
16      Q    I'm not suggesting that, sir.  I'm simply
17  saying 350 or so is not good, is it?
18      A    It's not good with the design of the building.
19  If you had a -- if you had a newer, better designed
20  building --
21      Q    But we don't.
22      A    -- not a high-rise, you could actually do a
23  good job with less employees if it was properly designed.
24      Q    But we don't have it, so we have to deal with
25  what's there.  Right?
```

1  A   Yes.
2  Q   I read recently -- just wanted to touch upon
3  this.  Maybe you can enlighten me -- that somebody in the
4  Oklahoma County Sheriff's Office filed a lawsuit against
5  you.  Is that correct?
6  A   Yes.
7  Q   I want to be very brief about this.  Who was
8  it?
9  A   It was Deputy McCully who works the metal
10 detector at the courthouse.
11 Q   What's the lawsuit about?
12 A   Well, he's -- I don't really know.  It's --
13 he's seeking a restraining order.  We have a hearing set
14 in March, and he filed it against myself as sheriff;
15 Danny Honeycutt, the legal --
16 Q   Uh-huh.
17 A   -- person for the sheriff's office; Mark Myers,
18 the PIO; Larry Grant, president of the FOP, and the
19 entire county FOP membership.
20 Q   What does Mr. McCully want?
21 A   I don't know.  He's running for sheriff.
22 Q   Okay.  Do you know what he says you did wrong
23 or did not do or whatever?
24 A   I have no idea where the man's coming from.
25 Q   When you submit requests for budgets, that'd be

130