FILED IN DISTRICT COURT
OKLAHOMA COUNTY

MAR 23 2023

RICK WARREN
COURT CLERK

IN THE SUPREME COURT OF THE STATE OF OKLAHOMA
IN THE DISTRICT COURT OF OKLAHOMA COUNTY, OKLAHOMA

| | | | |
|---|---|---|---|
| IN RE: | MULTICOUNTY GRAND JURY | ) | District Court |
| | SCAD-2021-61 | ) | No. GJ-2021-3 |

## FINAL REPORT

The Nineteenth Multicounty Grand Jury of Oklahoma received evidence and testimony throughout 2022 and 2023 regarding our investigation into the Oklahoma County Criminal Justice Authority and the Administration of the Oklahoma County Detention Center. Throughout the investigation, we have conducted examinations of 23 witnesses and received into evidence 26 exhibits for review in our inquiry. The attached report is the final results of our inquiry and is intended to provide the public findings of our investigation.

_____
Foreman
Nineteenth Multicounty Grand Jury of Oklahoma



PLAINTIFF'S EXHIBIT 1
CIV-20-1252-R

1

# 19th Multicounty Grand Jury

## Final Report Regarding Oklahoma County Criminal Justice Authority and the Administration of the Oklahoma County Detention Center

### Background of Investigation

On September 29, 2021, David W. Prater, District Attorney for Prosecutorial District 7 (Oklahoma County District Attorney) in and for the State of Oklahoma, herein petitioned the Oklahoma County District Court to convene an Oklahoma County Grand Jury pursuant to Article 2 Section 18 of the Oklahoma Constitution. The purpose of the grand jury was to investigate, among other items, the operation of the Oklahoma County Detention Center (OCDC). Shortly after the grand jury petition was granted, and after discussions between District Attorney David W. Prater, as well as counsel for the Oklahoma County Criminal Justice Authority (OCCJA), and the Oklahoma Attorney General's Office, Prosecutorial District 27 District Attorney Jack Thorp was appointed as the conflict prosecutor to conduct the investigation. This appointment occurred on November 4, 2021, and District Attorney Jack Thorp immediately began coordinating with the Oklahoma State Bureau of Investigation (OSBI), Northeast Region to conduct the investigation.

Among the issues highlighted by District Attorney Prater in his petition was the allegation that the Oklahoma State Department of Health (OSDH) had reported "unhealthy and even lethal uncorrected mismanagement of the Oklahoma County Jail... at least from the beginning of Fiscal Year 2020-2021 and has (sic) not abated, resulting in unhealthy jail living conditions..."

Other allegations involved the lack of physical security for both inmates and staff, and preventable loss of life within the jail since the OCCJA assumed management of the OCDC.

Since crimes and criminal acts by employees and inmates of the jail remain within the purview of the Oklahoma County District Attorney, the primary focus of District Attorney Thorp's investigation has been the OCCJA and the administration of the OCDC. Information and concerns have been received by the OSDH, OSBI, District 27 Drug and Violent Crime Task Force Investigators, the Oklahoma City Police Department, investigators assigned to the Oklahoma Attorney General's Office, the United States Drug Enforcement Administration, as well as Citizen Advocacy groups and whistleblowers. Because of the time limitations related to the Oklahoma County Grand Jury, District Attorney Thorp requested that the "jail investigation" be conducted with the State of Oklahoma's Multicounty Grand Jury (MCGJ).

During this investigation, witnesses and evidence have been presented to the MCGJ on five (5) occasions. Attorneys retained by the OCCJA have been cooperative throughout the

2

investigation and have readily provided materials to the legal advisors for the grand jury and have aided the grand jury in securing witnesses to provide testimony. Throughout this investigative process, the grand jury has received information in a neutral, unbiased manner, and with a spirit of dedication to correct perceived problems and shortcomings in the operation of the OCDC.

### Purpose of the Final Report:

The MCGJ is comprised of citizens who reside throughout Oklahoma. Each of these individuals carries with them the intent to serve the people of Oklahoma by sacrificing their time for an extended duration. Grand Jury proceedings are confidential. The attorneys who present evidence to them are considered legal advisors. Unlike a common criminal proceeding, the grand jury can interrogate witnesses and ask that the legal advisor(s) follow up on specific matters. Grand Jurors have the power to charge individuals or corporations with criminal charges by indictment. They may also gather information related to a specific topic and issue reports.

The MCGJ and District Attorney Jack Thorp, acting as legal advisor to the MCGJ, has been investigating the OCCJA and the administration of the OCDC for over fourteen (14) months. After considering the evidence that has been presented to the MCGJ, it became clear that a public statement (this Final Report) should be issued to aid citizens of the State of Oklahoma in learning about the OCDC. The purpose of this report is to identify issues discovered during this investigation and, when appropriate, make recommendations to the public, OCCJA, and OCDC Administration. This report is not intended to condemn but to provide information that can lead to an improved jail for the citizens of Oklahoma County. This report's highest purpose is to highlight those issues which, if remedied, will enhance the safety of the inmates incarcerated within the jail, and to the public who have the right to transparency in how taxpayer dollars are spent.

The jurors of the MCGJ believe that their inquiry and investigation has led to needed change within the jail. While much remains to improve Oklahoma County's Detention Center, much has changed within this fourteen (14) month investigation. Since the investigation began, the Chairman of the OCCJA, Chief Executive Officer of the OCDC, Chief Operating Officer of the OCDC, and Chief Financial Officer have resigned and currently an Interim Chief Executive Officer administers the day-to-day operations within the jail, while the "Trust" conducts a search for a permanent replacement. Several Trustees of the OCCJA have resigned their unpaid positions (for various unrelated reasons). The MCGJ has witnessed a complete overhaul of the Criminal Investigations Division of the OCDC. Finally, in June of 2022, the voters of Oklahoma County voted to approve a 260-million-dollar bond proposition that will partially pay to build a new Oklahoma County Jail facility. The MCGJ believes that some of the problems that the OCDC has encountered are directly correlated to a poor jail design and a facility that has not served the community adequately throughout its attenuated life span.

More must be done to fix and maintain Oklahoma County's jail. While this inquiry has come to an end, ==the OCDC remains under the watch of the United States Department of Justice==

(since 2008) and the OSDH. The MCGJ urges, the OSBI, the Oklahoma Bureau of Narcotics, Oklahoma County Sheriff, Oklahoma City Police Department and the Oklahoma Attorney General continue to engage and work together to address all allegations of wrongdoing or maladministration and hold those individuals in power accountable to Oklahoma County's citizens. Oklahoma County deserves a safe, humane, accountable, and effective jail – That has been the goal of this inquiry.

## Issues Addressed by the Multicounty Grand Jury

### United States Department of Justice Memorandum of Understanding

Problems and allegations of civil rights violations within the OCDC have been the subject of federal investigation since 2003. In 2008, Oklahoma County and the United States Department of Justice (DOJ) entered a Memorandum of Understanding, in which certain corrections of habitability and protections for inmates were required to be corrected and maintained. Since 2009, the OCDC has submitted to inspection and supervision by the DOJ. In the last year, DOJ attorneys with the Civil Rights Division have been in contact with the OCDC Jail Administration regarding their requirement to maintain compliance and a continuing order to improve conditions within the OCDC. No report from the DOJ has been provided to the MCGJ. It is notable that when this Memorandum was entered, the Oklahoma County Sheriff was required to operate the OCDC.

### Trust Indenture Creating the OCCJA

On May 22, 2019, Oklahoma County created the OCCJA to administer the OCDC pursuant to 60 O.S. § 176 et seq. This Trust was filed with the Oklahoma Secretary of State on June 10, 2019, and went into effect on July 1, 2020 (this document is a public record and available for inspection at the Oklahoma Secretary of State's office). It is notable that, at the time, the Oklahoma County Sheriff objected to the creation of the "Trust," as it took the power to administer the OCDC from the Sheriff and gave direct supervision of the jail to a Trust or group of individuals appointed in various manners. The Sheriff was, and continues to be, a member of the OCCJA. The current Oklahoma County Sheriff does not object to the OCCJA administering the jail.

The current trust indenture does not have any set process to raise funds for the operation of the jail. It is funded primarily through "pass through" money approved by the Oklahoma County Board of County Commissioners, with those funds being dedicated to jail operations and administered by the OCCJA. This inability to receive additional funding by a dedicated tax hampers the jail funding mechanism and inhibits the budgeting process. Recently, the interim CEO of the OCDC announced that there is a $1.6 million shortfall in the jail budget and that the OCDC, without further funding, will run out of money on June 1, 2023.

Throughout the investigation, the "best" way to administer the OCDC – Trust or Oklahoma County Sheriff – has been under debate. One primary reason to return to the Sheriff-administered jail structure is that, at a minimum, the Sheriff, an elected official, can be held accountable through the election process. The investigation has further discovered that for the

OCCJA to be terminated, the termination must be approved by a majority of members of the trust and approved by the Governor. While meetings and actions of the OCCJA are public in nature, the OCCJA itself is not subject to recall or removal by election. Two members of the Trust are elected officials. This insulation provides the OCCJA with the ability to make decisions they see as necessary and in the best interest of the OCDC, without facing any repercussions from the public. It is notable that no member of the OCCJA has training or experience in the administration of a correctional facility. The MCGJ believes that some person or persons with experience in county jail administration should be a member of the OCCJA.

Based upon the review of the OCDC and the OCCJA, the MCGJ recommends that the OCCJA self-terminate, that the Governor approve this termination, and that supervision of the jail be returned to the Oklahoma County Sheriff. It appears that, in some regards, improvements have been made to jail operations. However, those improvements do not appear to be related to the OCCJA. It seems more likely that they are the result of greater amounts of money dedicated to facility improvements.

## *The Oklahoma State Department of Health*

The OSDH has been a driving force in outlining problems with the OCDC for the last two years. Their concerns have been expressed in multiple inspections highlighting deficiencies that were turned over to the Oklahoma County District Attorney. These inspections are a public record and are viewable at the OSDH. The MCGJ has received information regarding the deficiencies identified by the OSDH Chief Jail Inspector. The MCGJ has reviewed these deficiencies, agrees that the deficiencies are generally material, and believes that the administration of the OCDC has not taken sufficient corrective action to remedy those deficiencies outlined in the last two (2) years. Along with the OSDH inspection reports, the MCGJ received a report authored by the National Institute of Corrections for May 2021. The latest follow up inspection by the OSDH, delivered on November 8, 2022, continues to assert multiple "repeat deficiencies" – such as bedbugs, dirty conditions, and severe understaffing – which has been an ongoing issue within the OCDC.

The administration of the OCDC has responded to the assessment and the deficient inspections on every occasion. In several cases, the administration has refuted the findings and/or offered explanations primarily related to problems with the OCDC facility. They have also pointed to a general improvement of the jail in matters relating to health and safety issues.

One explanation authored by the OCCJA is that the modern inspections are more rigorous. They point to an inspection from September 2018, where the jail inspection revealed that there were no deficiencies and that the OCDC was in substantial compliance with OSDH jail standards. Since 2018, there has been a change in the office of "Chief Jail Inspector" with the OSDH. The OCCJA has also submitted 2021 and 2022 annual reports that clearly highlight numerous changes to the jail that must be acknowledged as improvements.

An issue that one member of the OCCJA has asserted in defense of the repeated deficiencies found in OSDH inspections is a poor relationship between the OCCJA and the former Oklahoma County District Attorney. This assertion alleges that the OSDH has been

5

especially rigorous because the Oklahoma County District Attorney opposed the creation of the OCCJA and favored a plan where the OCDC was administered by a former Oklahoma County Sheriff. The MCGJ has explored this allegation and finds there is no evidence that this is true. While the former Oklahoma County District Attorney vigorously objected to the creation of the OCCJA, no evidence has been found of a "more than professional" relationship between that District Attorney and OSDH inspectors, supervision, or administration. Former Oklahoma County District Attorney did receive deficient inspection reports with an accompanying letter and was consulted, but the MCGJ found nothing undue. Further, the National Institute of Corrections Report and Assessment corroborated the deficiencies outlined in the OSDH inspections.

After repeated warnings to the OCCJA and the OCDC, the OSDH ultimately filed an administrative lawsuit on June 24, 2022, alleging multiple uncorrected deficiencies within the OCDC. On February 15, 2023, the OCCJA and the OSDH announced a tentative agreement to settle the lawsuit and a court stayed the proceedings pending the formal settlement. According to information discovered by the MCGJ, the OCCJA has tentatively agreed to spend $175,000.00 to fix health and safety issues within the jail. This agreement to spend the dedicated money to "health and safety issues" would be in lieu of paying a $75,000 fine to the State. In exchange for this agreement the OSDH agrees to dismiss their lawsuit.

The MCGJ urges the OCCJA to continue cooperating with the OSDH to address issues highlighted in the mandatory inspections and to take steps to improve the conditions that inmates endure within the OCDC. The MCGJ believes that the OSDH has no ulterior motive in its inspections and litigation, but to use those means necessary to enforce jail regulations and standards for the protection of inmates. The MCGJ further urges that OSDH Chief Jail Inspector, who has a particular expertise in the eradication of insects, to offer advice and training to OCDC Administration to aid in the removal of bed bugs, roaches, and other infestations within the jail.

### *Financial Irregularities with the use of Chief Financial Officer's Personal Credit Card*

When the OCCJA assumed management of the OCDC from the Oklahoma County Sheriff on July 1, 2020, all aspects of the jail's management shifted to the OCCJA, including the necessity of creating an entirely new financial operations system. Shortly after this assumption by OCCJA, a Chief Financial Officer (CFO) was named whose experience was based in the private business sector. The turnover of management was problematic, as the former manager, the Oklahoma County Sheriff, disagreed with the decision to turn management of the jail over to a public trust. In many ways, the OCCJA was required to begin management of the jail without any foreknowledge of the processes already in place.

As originally discovered by the Oklahoma State Auditor, and reported to the Oklahoma County District Attorney, the lack of government purchasing experience led to an issue when reviewing Oklahoma County's fraud risk audit. This audit uncovered a problem with purchasing related to the jail. Specifically, the CFO was being reimbursed by the Oklahoma County for

6

purchases made on a personal credit card for alleged jail operations expenses. According to information provided to the MCGJ, 87 purchases were made and reimbursed by Oklahoma County that totaled $117,889.48. Purchases and subsequent reimbursement to the personal credit card of the CFO, and identified as "fraud risk," were ultimately determined to be for the benefit of the OCDC. The concerning purchases included vendors, such as Cabela's, Bass Pro Shops, Amazon, and Pizza Hut, and had an appearance of impropriety.

The Title 60 trust that created the OCCJA also called for audits to be conducted by an auditor other than the Oklahoma State Auditor. This irregularity was caught as part of the Oklahoma State Auditor's review of Oklahoma County's purchasing and reimbursement. Once this information was received from the Oklahoma State Auditor, the MCGJ conducted a separate investigation into these purchases and discovered that the "irregular" purchases were all made for the benefit of the OCDC. The CFO was reimbursed for the use of his personal credit card and did not receive any monetary benefit for the purchases (travel miles, credits, or discounts). Arguably, the CFO did receive a benefit in the use of credit and subsequent payment of debt, which likely did benefit his cumulative credit score. The use of the personal credit card was authorized during the initial period of financial transition and, according to the inquiry, was emergent in nature to operate the jail. The initial problems with governmental purchasing were remedied and the MCGJ has found that no fraud or abuse occurred from that audit. However, the MCGJ encourages the OCCJA to refrain from these types of reimbursable expenses and adhere to more traditional governmental purchasing procedures that are equally transparent and adhere to sound accounting principles.

## *The Oklahoma County Detention Center Facility*

When the OCCJA was formed and assumed supervision of the OCDC in July of 2020, the facility was in a terrible state of disrepair. The facility has design and construction problems that have caused significant issues and led to an unsafe environment for inmates. Since 2020, the OCCJA has expended more than ten million dollars (Cares Act and County Approrpriations) to address heating and air issues, sewer problems, fire control, and insect eradication procedures. The OCDC 2022 Annual Report contains a wealth of information regarding these improvements, and it is a readily available report found on their website. This report was presented to the OCCJA in open session. The jurors do note that insect infestation has and continues to be a concern for inmates – primarily problems with bedbugs.

The grand jurors received evidence that one of the most significant design flaws within the jail is its cinderblock construction and the ease in which inmates can break through the walls, including the external walls. Apparently, concrete was not used to fill inside the cinderblocks and these blocks are easily broken. Testimony was also developed that inmates routinely break holes in the external walls of the jail and use "line" to lower down the side of the building, where individuals will provide drugs and contraband that can be pulled back into the cell. There has also been testimony that inmates can literally break down walls and tunnel in-between cells, which is a significant health risk. Further information was received that some of the cells' windows are damaged to the point of making it nearly impossible for detention officers to conduct site checks without opening the cell. The "high rise" nature of the building (13 stories)

7

creates significant problems for detention officers to respond in a timely manner. The elevators are often in disrepair and limit the speed in which a detention officer can respond in an emergency.

It is the general belief that the OCDC facility needs replacement, and the MCGJ supports building a new, safer, and more secure facility. Further, the MCGJ encourages a design that embraces modern corrections technology.

### Jail Deaths

The single most concerning problem that the MCGJ investigated is the large number of inmate deaths that have occurred since the OCCJA assumed management from the Oklahoma County Sheriff on July 1, 2020. According to testimony, 73 inmates died, or became ill and died, in the Oklahoma County Jail from the period 2000-2019. Since the "Trust" has been in place, 37 inmates have died or became ill and died in the jail since July 1, 2020. Each inmate death is different and tragic, but many of the deaths were preventable. It is worth noting that since the former Chief Executive Officer has resigned, there have been two (2) deaths in the jail.

The MCGJ has uncovered significant issues within the jail and the administration that could contribute to the significant number of deaths. Each death in the jail is a separate, potential homicide case, and those cases would be within the jurisdiction of the Oklahoma County District Attorney. Some of those cases have been submitted to the District Attorney for criminal charges, others have not.

According to testimony and the investigation, three (3) major issues have led to deaths in the jail – inadequate controlled dangerous substance interdiction, inadequate health screening during the intake process, and the failure of detention officers to conduct proper site checks on inmates. Illness is the predominant cause of death in the jail.

While the possession and use of controlled dangerous substances is not as uncommon as it should be within a detention facility, the predominance of opioids within OCDC is horrific. Testimony has been provided that fentanyl has been found to be behind postage stamps mailed to inmates. Illegal drugs are entirely too common in the jail. With the recent increase in fentanyl usage, overdoses have increased incrementally and have led to death within the jail.

The OCDC utilizes a contracted medical service provider for inmate care. Requiring an enhanced health screening would provide an increased likelihood of preventing death in the jail. Inmates with potentially symptomatic issues should be evaluated by health professionals at the time of booking. Health screening and accurate medical evaluation could likely identify health factors that can be relayed to judges and prosecutors, and aid in the presentation of "own recognizance" bonds where inmates could utilize medical services outside the jail environment – a place not necessarily suited for the ill.

Site checks on inmates every half hour would also reduce the death rate in the jail. Questions remain as to whether staffing levels have been adequate for conducting the necessary site checks. These site checks, required under jail regulations, have not been adequate and falsified site checks have led to deaths in the jail. Another way site checks could potentially

8

reduce the death rate is by improving suicide prevention. Since 2021, at least three (3) inmates have died by hanging.

The Covid-19 pandemic has also impacted the OCDC and caused at least six (6) of the 37 deaths. However, considering the population and difficulties with social distancing protocols while incarcerated, this number could have been much higher. This pandemic did provide a substantial influx of federal government funding (CARES Act) that greatly benefited the jail and aided the OCCJA in providing additional funding for corrective physical plant enhancements within jail infrastructure.

The MCGJ finds that the former Chief Executive Officer of the OCDC did not take proactive or effective steps to curb the significant death rate in the jail.

The MCGJ believes that inadequate staffing, funding, surveillance, and training, coupled with poor law enforcement protocols, led to the significant loss of life within the jail. Discussion of protocols is reserved within the section of this report regarding criminal investigation; however, an effective and interested administration should have taken more proactive steps to address these obvious problems in the jail. This is especially true considering the significant number (37) of deaths in the jail since management of the jail shifted from the Oklahoma County Sheriff to the OCCJA on July 1, 2020.

## *Hiring Issues*

One of the most significant issues observed by the MCGJ is the inability of the administration of the OCDC to properly staff the jail with experienced employees. It is recognized that work as a detention officer is a difficult job, in which employees must deal with individuals who are being held against their will and, in many cases, involve individuals who are accused of violent and dangerous crimes. Many of the inmates are generally unhealthy and require advanced levels of supervision. Additionally, many inmates have significant addiction issues and controlled dangerous substances seem to be readily available within the closed environment. The jurors applaud recent efforts to screen employees and admittees to reduce the number of drugs within the jail. The jurors also support efforts by the past administration to purchase and implement x-ray scanners for all persons that enter the facility.

The MCGJ has learned that individuals have purposefully committed arrestable crimes so they can "smuggle" drugs into the facility. The jury believes that employees in the past, and possibly some current employees, have a "vested interest" in aiding the import of drugs into the jail. The jury has also learned that background checks have been limited, in the interest of filling positions, and members of organized criminal gangs have been able to secure employment as detention officers and have aided in the introduction and distribution of controlled dangerous substances within the jail, leading to loss of life and requiring lifesaving use of Narcan to resuscitate persons overdosing on opioids. It is troubling to the MCGJ that, according to testimony of witnesses, administrative staff were warned and allegedly ignored concerns by some investigative staff that criminal street gang members were being hired as detention officers. According to information provided to the MCGJ, at this time the OCDC needs an additional 100 detention officers at a minimum.

The MCGJ recognizes that it has been difficult for the OCDC to hire and retain employees for the position of detention officer. The MCGJ recommends that the OCCJA raise the beginning salary for this important position within the OCDC or, if possible, a signing bonus payable after 90 days of service to OCDC to recruit and retain detention officers. The MCGJ further recommends that the OCCJA consider a program with local law enforcement officials that will allow better opportunities for Detention Officers to receive law enforcement certifications. The MCGJ recommends that candidates for the position of Detention Officer who are under the age of 21 receive extended training and supervision. The MCGJ supports staffing the OCDC with an additional 100 detention officers and to bring the total number of employees within OCDC to 409. The MCGJ believes additional staffing will save inmates lives.

### *Criminal Investigations within the OCDC*

As discussed in the section describing the 37 deaths in the OCDC since the OCCJA took over administration of the jail, there are serious concerns with the possession, distribution, and consumption of controlled dangerous substances in the jail. Besides the drug-related offenses that occur inside the OCDC, other crimes – including homicides, rape, assault, and sex crimes – are commonplace. An experienced and dedicated investigative unit is necessary to maintain order within the jail.

Within the "Trust" that created the OCCJA, it also created a separate law enforcement organization. The investigative staff of the OCDC has primary responsibility for criminal investigations within the jail. During the pendency of this investigation, this agency has employed as many as five (5) investigators. During the summer of 2022, the number of dedicated certified officers was two (2). It was during this summer when the MCGJ learned that the Investigations division was 73 investigations behind. It was also during the summer of 2022 when the MCGJ learned that a shackled inmate was raped by an unshackled inmate in the booking area of the jail. The investigation that led to the inmate being charged with that rape took nearly two (2) months before it was presented to the Oklahoma County District Attorney for charges.

As part of this investigation, the MCGJ learned that jail deaths were not investigated as homicides unless there were apparent signs of an intentional criminal act. Drug overdoses within the jail were likewise not investigated as homicides. In fact, jail investigators were unaware that the distribution of a controlled substance that causes a death was a potential felony murder charge. Recently the MCGJ learned of large amounts of Narcan disbursement for opioid overdose within the jail. That this lifesaving technique is also a tool for investigations that has been neglected in the jail, as each use of Narcan should be followed up as a drug investigation. The MCGJ also learned that there was a communication problem between the former chief investigator and the OCDC administration as to who had authority to seek OSBI assistance in investigations. The MCGJ learned that there was no system within the OCDC criminal investigative system to routinely receive Office of Chief Medical Examiner reports of death (autopsies). The MCGJ also learned during this investigation that the Chief of Investigations for the OCDC had neither the training nor experience to investigate homicides. Finally, the MCGJ learned that investigations of death in the jail were not routinely submitted to the District

Attorney for review. While some investigators routinely communicated with the office of District Attorney, those investigators were ultimately terminated – the purpose of termination is disputed.

Toward the end of 2022, the OCDC administration made significant changes to the OCDC investigative division. The former chief investigator was reassigned within the investigations division. A new chief investigator was retained, along with at least two (2) other investigators with homicide investigation experience. As a change of policy within the jail, deaths were to be investigated as homicides. The OSBI is now consulted on jail deaths. Autopsy reports are now requested and received routinely. The Oklahoma Bureau of Narcotics (OBN) have been consulted regarding drug investigations within the jail. Jail deaths, as well as other criminal matters, are submitted to a newly established OCDC liaison within the Oklahoma County District Attorney's Office. The MCGJ has been advised that the new chief investigator has met with the OSBI, as well as the OBN, to facilitate better law enforcement response, investigations, and greater partnerships with law enforcement with greater experience to help OCDC investigators better investigate crime within the OCDC.

It is the opinion of the MCGJ that these changes and further changes should continue within the OCDC Criminal Investigations division. The MCGJ believes that all deaths within the jail should be investigated as homicides and that each death investigation be reviewed by the Oklahoma County District Attorney. The MCGJ urges OCDC Investigative Chief to authorize, cooperate in, and report the findings of a complete examination and audit of the OCDC evidence retention room/locked facility. The MCGJ recommends the OCDC purchase a narcotics K9 for utilization within the Oklahoma County Jail. The MCGJ further urges that all employees, contractors, investigators, inmates, trustees of the OCCJA, visitors submit to body searches before gaining entrance to the secure areas of the OCDC.

## *Alleged Real Estate Development Conspiracy*

The MCGJ received an allegation that there was a conspiracy between members of the community involving the relocation of the OCDC. It was alleged that the conspiracy was linked to the campaign that ultimately led to passage of the $260 million bond issue that put into place funding for a new Oklahoma County Jail. According to information provided to the MCGJ, the reasoning behind the bond issue was that the current site of the OCDC would be an excellent site for real estate revitalization in downtown Oklahoma City, that the OCDC's location depressed the area in downtown Oklahoma City, and that its removal would lead to a construction boom for real estate developers, who saw the relocation of the OCDC as a way to develop the site, and potentially make significant profit for the development.

After a thorough investigation by the OSBI, including consultation with developers, county officials, and members of community action coalitions, no evidence of wrongdoing was discovered. The MCGJ determined that the area surrounding the OCDC is currently under development. The MCGJ found that, should the OCDC be relocated to an area outside the downtown Oklahoma City area, the property would likely be sold by Oklahoma County in the manner prescribed by law.

11

## *Potential Obstruction between OCDC Inhouse Attorney and Oklahoma County District Attorney*

Throughout the MCGJ investigation, information regarding the OCDC Administration and the Oklahoma County District Attorney has arisen. The Oklahoma County District Attorney is the prosecuting authority for crimes that occur within OCDC. The MCGJ received information that at least two (2) OCDC investigators routinely provided information to the Oklahoma County District Attorney about crimes within the jail, as well as issues internal to jail operations. During the spring of 2022, these investigators were terminated by OCDC Administration. According to OCDC Administration, these terminations were unrelated to their discussions with the Oklahoma County District Attorney. These investigators were also providing information about internal jail operations to the District Attorney for District 27 and legal advisor to the MCGJ regarding their investigation into the OCCJA and OCDC Jail Administration.

On one occasion, a former OCDC investigator advised the MCGJ of a meeting between an OCDC investigator, the OCDC Inhouse attorney, and the Oklahoma County District Attorney. According to the investigator, this was a presentation of an investigation where a detention officer falsified a site check log and, as a result, an inmate passed away within the jail. According to the presentment, this failure to conduct a site check could have led to the death of the inmate. When the information was presented to the Oklahoma County District Attorney, an inquiry as to the "actual staffing levels" and whether it was feasible to adequately conduct site checks considering those staffing levels, led to a disagreement with the OCDC Attorney and the Oklahoma County District Attorney. This disagreement was witnessed by at least two (2) OCDC investigators.

This disagreement led to an alleged statement by the OCDC Attorney, who told an investigator that they would "never give that type of information to the DA." It is alleged that from the time of the encounter between the OCDC Inhouse Attorney and Oklahoma County District Attorney, the OCDC attorney was no longer "allowed" to be present when "requests for criminal charges" meetings took place. The MCGJ believes that staffing levels and information about the internal operation of the jail would be relevant for a prosecutor when the prosecutor is making decisions as to whether a detention officer willfully neglected his duty to supervise inmates in his charge. It is further alleged that the OCDC Inhouse attorney began to review and "modify" police reports before those reports were submitted for criminal charges presentment.

The MCGJ considered these allegations about OCDC Inhouse attorney and did not determine whether these allegations were "obstruction" per criminal statutes. Clearly OCDC Inhouse attorney has a duty to represent a client – in this case the OCDC, and specifically those individuals in an administrative capacity that he has a duty to advise in that circumstance. However, modification of police reports (if true) or willfully restricting access to information necessary for a prosecutor to make a charging decision could be considered obstruction. The MCGJ invites additional information and investigation into these allegations and requests, Conflict District 27 District Attorney to refer this potential "obstruction" to the OSBI for further investigation, and at the completion of the investigation consult with Oklahoma Attorney

12

General and Oklahoma County District Attorney as to jurisdiction for the potential of filing charges by criminal information.

### *Drug Enforcement Administration Investigation within OCDC*

In the spring of 2022, a joint investigation into the distribution of controlled dangerous substances within the OCDC was conducted by the United States Drug Enforcement Administration, and in conjunction with the Oklahoma Attorney General's Office and the District 27 District Attorney. This operation included an investigator with the OCDC. During this investigation, a confidential informant was developed within the jail and was provided resources to purchase controlled dangerous substances within the jail. The confidential informant met with law enforcement and provided information about the illegal distribution of drugs in OCDC.

The drug operation abruptly ended in the summer of 2022. Later, information was discovered by the MCGJ in late summer 2022 that the OCDC administration had changed their position on the investigation and chose to no longer cooperate with the investigation. No reason was given by the OCDC administration for their decision. Even though this investigation was discontinued, the MCGJ has been apprised of other steps taken by OCDC investigators to investigate the distribution of controlled dangerous substances within the jail. The MCGJ has also received information about other methods utilized by OCDC to interdict crime coming into the jail, such as x-ray scanners and searches of employees. It is notable, and has been proffered to the MCGJ, that employees of the contract medical provider for OCDC are not subject to these body searches.

### *Use of American Rescue Plan Act (ARPA) funds for the OCDC*

The MCGJ received information that the OCCJA and the OCDC has utilized funds provided by ARPA to offset costs associated with the administration of and in support of the Oklahoma County Jail. On January 3, 2023, a Memorandum of Understanding had been executed between the Oklahoma County Board of County Commissioners and the OCCJA. This was a prerequisite to approval of up to $5,685,293.85 of ARPA monies dedicated to projects associated with the OCDC. As of this date, no ARPA monies have been received by OCCJA for use in administering the OCDC.

### *Relationship between the OCCJA and the Former Oklahoma County District Attorney*

As provided above in the "Background" section of this report, the former Oklahoma County District Attorney began this investigation with his petition to investigate the OCCJA and the OCDC as part of an Oklahoma County Grand Jury Investigation. Since his recusal and investigation reassignment by the Oklahoma Attorney General, he has recused from furthering his investigation into allegations about the OCCJA. The MCGJ has received information that the former District Attorney was not a supporter of the creation of the OCCJA. The MCGJ has also received information that the former DA did receive notice of the last four deficient OSDH Inspections of the Jail. According to information presented to the MCGJ, the notice the former

13

DA received from the OSDH was statutory in nature, and his actions in seeking additional investigation were appropriate given his duty.

The MCGJ has investigated whether the former Oklahoma County District Attorney has encouraged the filing of the OSDH lawsuit against the OCCJA. According to information received by the MCGJ no evidence supports this assertion. No evidence has been received by the MCGJ that the former Oklahoma County District Attorney caused the OSDH to be stricter in their inspections of the OCDC. While the former Oklahoma County District Attorney had expressed concerns with the formation of the OCCJA, and the significant crime and loss of life within the OCDC during his tenure as DA, no evidence exists of undue influence.

### *OCCJA Response and Cooperation with the MCGJ Investigation*

The OCCJA and their attorneys have cooperated fully with this MCGJ investigation. Information was readily provided to the MCGJ, including information that was potentially inculpatory or embarrassing to the Trust. The Trustees that have participated in the presentation to the MCGJ have been honest, earnest, and appear to support what is, in their opinion, the best interests of the OCDC. While there is clearly a dispute as to what is in the best interests of the OCDC, the MCGJ recognizes that the role of Trustee on the OCCJA is an unpaid, philanthropic, and difficult service to the Oklahoma County community.

### *Recommendation Regarding Potential OCDC Closure*

Pursuant to 74 O.S. § 194, it is possible to close the OCDC for habitual non-compliance and failure to correct deficiencies outlined by the Commissioner of the OSDH. The MCGJ notes that OSDH Commissioner wrote a letter to this effect on November 23, 2021. However, since that date, the Commissioner has not made that request again.

The Statute reads:

*"If the deficiencies listed in the report have not been corrected, within sixty (60) days after delivery of the report, the Commissioner of Health shall be authorized to file a complaint with the Attorney General or the district attorney for the purpose of assistance in obtaining compliance or to close the deficient facility. Provided, that upon demonstration of a good-faith effort by the governmental entity involved to correct said deficiencies and achieve compliance with the established standards, the Commissioner of Health shall extend the time for compliance a reasonable period before filing the complaint requesting assistance in obtaining compliance or the closing of the facility. An action to close such facility shall be brought in the district court having jurisdiction in the county in which the facility is located. Upon the issuance of an order by the district court to close the facility, the facility shall be closed and prisoners shall be removed to a suitable facility at the expense of the governmental entity responsible for the facility ordered closed. Provided, that upon demonstration of a good-faith effort by the governmental entity involved to correct said deficiencies and achieve compliance with the established standards, the district court shall extend the time for compliance a reasonable period before ordering the facility closed."*

14

The MCGJ does not recommend closure of the OCDC.

## Conclusion

The MCGJ would like to thank for their dedication to the cause of justice in this investigation the following: The Oklahoma Attorney General, the Oklahoma State Bureau of Investigation, the Oklahoma Bureau of Narcotics, and the Office of District Attorney David Prater, Oklahoma County. This investigation and presentment to the MCGJ has required hundreds of hours to prepare, investigate, and present.

Finally, the MCGJ would like to thank District Attorney Jack Thorp, District Attorney for District 27 for his work with us in investigating the OCCJA and the OCDC. Jack Thorp and his staff, specifically Kim Hall, former First Assistant District Attorney for District 27, have been professional, conscientious, and dogged in their pursuit of the cause of justice in this matter. The MCGJ would also like to express thanks to the Attorney General's Office, staff, Tara Shields and Crystal Ryan.

CERTIFIED COPY
AS FILED OF RECORD
IN DISTRICT COURT
MAR-2 3 2023
RICK WARREN COURT CLERK
Oklahoma County