UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA

BILL AND RHONDA SPRAY,            )
Individually and as Representatives of    )
THE ESTATE OF SINDI SPRAY,        )
                                  )
              Plaintiffs,          )
                                  )
v                                 )        Case No. CIV-20-1252-R
                                  )
THE BOARD OF COUNTY               )
COMMISSIONERS OF OKLAHOMA          )
COUNTY, et al.                    )
                                  )
              Defendants.          )

**PLAINTIFFS' RESPONSE TO DEFENDANT'S MOTION TO EXCLUDE**
**EXPERT OPINION TESTIMONY OF PLAINTIFFS' EXPERT**
**SUSAN LAWRENCE, M.D.**

Respectfully submitted,

*s/ Danny K. Shadid*
Danny K. Shadid, OBA No.8104
DANNY K. SHADID, P.C.
6307 Waterford Blvd., Suite 230
Oklahoma City, OK 73118
Phone: (405) 810-9999
E-mail:Danny@ShadidLaw.com
*Attorney for Plaintiff*

July 31, 2023

## CONTENTS

**ARGUMENT AND AUTHORITIES** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**I.**     **DR. LAWRENCE'S REPORT** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .4

**II.**     **THE ENTIRETY OF DEFENDANTS PROPOSITION III. DEALS WITH CERTIAN TYPES SOF MEDICAL CARE PROPRITLY NOT RISING TO THE LEVEL OF CONSTITUTIONAL VIOLATIONS, ALL OF WHICH ARE IRRELEVANT TO THE SUBJECT OF DR. LAWRENCE'S QUALIFICATIONS AS AN EXPERT**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .18

## TABLE OF AUTHORITIES

## CASES

*Bley v. Independent School District No. 1-002* of Oklahoma County*,* . . . . . . . . . . .9,10,15
Case No. CIV-21-1026-R, 2023 WL 3608909 (WD Okla. May 9, 2023)

*Carskadon v. Armor Correctional Health Services, Inc.,* . . . . . . . . . . . . . . . . . . . . . . . 14
CIV-18-1013-G, 2022 WL 2813526*8 (May 29, 2020)

*Foreman v. Okla. Cty Sheriff,* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .14
No. CIV-21-1062-F 2022 WL 2513384 (WD. Okla. July 6, 2022)

*Specht v. Jensen,* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
853, F.2d 805, 809 (10th Cir. 1988)

*United States v. Bedford,* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
536 Fed.3d 1148, 1158 (10th Cir. 2008)

*United States v. Richter,* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .5, 6, 7, 8
796 F.3d 1173 (Tenth Cir. 2015)

*Willis v. Oklahoma Cnty. Det. Ctr..* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .15
No. 18-CV-00323-D 2019 WL 4409219, WL 4409219, at *6 (W.D. Okla. Sept. 13, 2019)

## RULES

Fed.R.Civ.P.26 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .4, 11

Fed.R.Civ.P.26 (a)(2). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .11

Fed.R.Civ.P.26 (a)(2)(B)(i) and (ii). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .11

Fed. R. Civ. P. 12(b)(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Fed.R.Evid. 701 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .6

Fed.R.Evid. 702 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .6, 17

Fed.R.Evid. 704 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .6

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| BILL AND RHONDA SPRAY, | ) | |
| Individually and as Representatives of | ) | |
| THE ESTATE OF SINDI SPRAY, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v | ) | Case No. CIV-20-1252-R |
| | ) | |
| THE BOARD OF COUNTY | ) | |
| COMMISSIONERS OF OKLAHOMA | ) | |
| COUNTY, et al. | ) | |
| | ) | |
| Defendants. | ) | |

## PLAINTIFFS' RESPONSE TO DEFENDANT'S MOTION TO EXCLUDE EXPERT OPINION TESTIMONY OF PLAINTIFFS' EXPERT SUSAN LAWRENCE, M.D.

COME NOW the plaintiffs, William Spray and Rhonda Spray, by and through their attorney, Danny K. Shadid, and for their objection and response to Defendant's Motion to Exclude Expert Opinion Testimony of Plaintiffs' Expert Susan Lawrence, M.D., (Doc. No. 53), states as follows:

## ARGUMENT AND AUTHORITIES

1.    The plaintiff cites and adopts herein by reference the entirety of the Report of Susan E. Lawrence, M.D., and her CV attached thereto, attached as Exh.1(Doc. No. 53-1) to the defendant's Motion, and which is all adopted and incorporated herein by reference.

2.    The plaintiffs also adopt and incorporate herein by reference all legal authorities and legal arguments set forth in Plaintiff's *Daubert* Motions to exclude the testimony of defendant's proferred experts, (Doc. Nos. 51 and 52) which contain the

standards of law applicable to *Daubert* motions.

    3.    As is intimated on Page 1 of its Motion, the defendants' primary aim in attacking Dr. Lawrence is really a backdoor attack on the plaintiff's use of the United States Department of Justice's Report of 2008 (DOJ Report), the Memorandum of Understanding (MOU) entered into between the Oklahoma County Board of County Commissioners and the United States Department of Justice on October 28, 2009. A more complete discussion of the DOJ Report and the MOU is set forth hereafter. However, given the defendant's continued claims that the DOJ Report and the MOU are to old or too remote to be evidence in the present case, and even in light of a prior Western District Orders addressing the DOJ Report and the MOU in contexts not presented in the present case, it must be noted from the outset that the Oklahoma Multicounty Grand Jury, sitting in Oklahoma County, issued its Report of its investigation of the Oklahoma County Jail on March 23, 2023. A copy of that Report is attached hereto as Exhibit 1. In that Report, the Multicounty Grand Jury clearly addressed the fact that the Oklahoma County Jail has been under investigation for matters including, *inter alia*, lack of staffing, lack of funding, lack of training, excessive deaths and inadequate medical care as far back as 2003, with the DOJ Report being issued in 2008. The Multicounty Grand Jury recognized the existence of the MOU in 2009 which also addressed the same problems. Now, in 2023, the Multicounty Grand Jury, after its investigation of 18 months, rendered conclusions that the Oklahoma County Jail was still under staffed, that there continued to be excessive deaths, that adequate medical care was lacking and that the

DOJ **was still overseeing the County Jail** at the present time. *See* Exh. 1 at 3-4.

Moreover, the defendant's statement that the MOU had expired four (4) years prior to the incident involving Sindi Spray is blatantly false. The MOU, by its own terms and as signed off by the Board of County Commissioners in 2009, expressly states that the MOU "shall terminate five (5) years after the effective date of the MOU, *if* the parties agree that the Jail is in substantial compliance with all provisions of this agreement and has maintained substantial compliance with all provisions for twelve (12) months. . . ." (Emphasis added.) *See* Exh. 2, MOU, Section 74, at 32. The Multicounty Grand Jury, in its Report of March 23, 2023, specifically notes that the DOJ has not released the County and that the Jail "remains under the watch of the United States Department of Justice (since 2008). . . ." *See* Exh. 1, Grand Jury Report at 3-4.

Plaintiff reiterates to the Court that the use of the DOJ Report and the MOU, as well as the Grand Jury Report, in this case is not for purposes of showing that the precise type of injury suffered by Sindi Spray is a matter discussed in the DOJ Report or the MOU. The use of the DOJ, the MOU, and as recognized by the Grand Jury, is that Oklahoma County, itself, has exhibited a deliberate indifference, *inter alia*, to the staffing at the Jail, funding of the Jail, training of security and medical personnel, overall oversight of the Jail for many years after being given repeated chances to rectify the various problems that the Jail, which include staffing, training, and lack of medical care for detainees. This is proof of the deliberate indifference exhibited by Oklahoma County and its policy and decision makers regarding the Oklahoma County Jail.

I.    **DR. LAWRENCE'S REPORT**

The defendant chides Dr. Lawrence's Report as being a "summation of facts." In this regard it must be remembered that Fed.R.Civ.P.26 requires the expert to state the basis for the experts specific opinions. This is precisely what Dr. Lawrence did. In reciting her several opinions, Dr. Lawrence stated specific underlying facts that she had reviewed to arrive at her opinions which, as she stated in her Report, and as specifically allowed under Rule 702, were based upon her specialized knowledge, education, training and experience. She did not simply recite a summary of the facts. Rather, Dr. Lawrence demonstrated for the Court not only her knowledge of the case but also the methodology of reviewing all of the materials that were listed in her Report (Def. Exh. 3, Doc. 64-1 , at 5-7).

The defendant states, without any underlying explanation of fact or law, that Dr. Lawrence is not qualified to render opinions regarding medical care. For reasons that can only be obvious, the defnedant makes no reference to Dr. Lawrence's 30 year history as a medical doctor, board certified in internal medicine.

The defendant argues that Dr. Lawrence follows her discussion of her underlying facts with a conclusory statement that "as a result of the County's unconstitutional, conscience disregard for the circumstances and requirements of Oklahoma detainees, Ms. Spray languished without appropriate medical care and died a needless, preventable death." Defendants Motion at 3. The only possible portion of this statement which maybe subject to limitation on Motion in Limine, and not a disqualification of Dr. Lawrence on her qualifications or reliability of opinion, is the word " unconstitutional." At the appropriate

time, if the Court believes it necessary, Dr, Lawrence's testimony can be limited such that she refrains from using the word "unconstitutional" when rendering opinions as to the defendant's overall conscience disregard for the circumstances and requirements of Oklahoma detainees. Dr. Lawrence made it clear in her deposition that her use of the term "unconstitutional" was in the context of having reviewed the DOJ Report and MOU for what the DOJ determined to be constitutional defects at the Oklahoma County Jail. *See*, Exh. 3 hereto, Depo. of Dr. Lawrence, at 35:18-25, 36:1-10, 37:9-25, 38:1-6, 39:5-13, 40:18-25, 42:10-14 and 45:2-6. The defendant attempts to suggest that Dr. Lawrence was opining as a lawyer when stating her opinion and using the word unconstitutional. The words of the DOJ Report. *See* Exh. 4, Excerpt of the DOJ Report at 1, 2, 13, 14, 20, 21 and 22. The MOU also recited, in clear language, the requirement for improvement in providing medical care to Oklahoma County Jail detainees. See Exh. 2, Excerpt of the MOU, at §§12-29.

The defendant cites *United States v. Richter*, 796 F.3d 1173 (10th Cir. 2015). The defendants reliance on *Richter* is not only misplaced, but borders on the disingenuous. *Richter* was a criminal action dealing with the alleged illegal exportation of hazardous waste, *i.e.*, cathode ray tubes, which the state of Colorado had declared to be unfit for landfills because the tubes contained lead. As part of the governments rebuttal testimony, the government put on an employee of the Colorado Department of Public Health and environment. The Departments employee testified that, contrary to the defendants claim that the tubes were being sold for reuse in new television monitors te use of the tubes were consistent with the original intended purpose of the tubes and therefore could not constitute

a criminal violation. On rebuttal, the government put on the departments employee who testified that if a tube was rehoused in another monitor constituted waste because the reuse required *Id.*, at 1181 and 1194. The Court reversed the convictions on all counts regarding smuggling, wire fraud and mail fraud on the basis that the departments employee was not proffered as an expert, but in fact provided expert testimony and, as such, "exceed the bounds of permissible testimony by infringing upon the provence of jury." *Id.* at 1194. However, *Richter* must be discussed in context. In that case, the Court of appeals discussed at length the interrelation between Rule 701, 702 and 704. The Court pointed out that Rule 701 allows a witness who "is not testifying as an expert" to offer an opinion based on witnesses perception, helpful to understand the witnesses testimony or to determine a fact at issue, and "not based on scientific or technical or other specialized knowledge within the scope of Rule 702." Id. at 1194, 1195. The Court in *Richter* then went on to point out that Rule 702 governs the testimony of experts and stated that "a party may not ' evade the expert witness disclosure requirements . . . ' by simply calling an expert witness in the guise of a lay person." *Id.*, at 1195, *citing* Fed.R.Evid. 701 advisory committees note. The Court of Appeals criticized the government for not attempting to qualify the employee as an expert and then putting him on to affective opine regarding the cathode ray tubes becoming waste as a result of the employees technical and specialized knowledge while working with the Colorado Department of Public Health and Environment. *Id.* at 95. The Court in *Richter* stated that the employees opinion " was improper expert testimony offered in the guise of lay testimony" *Id.* The Court further discussed Rule 704 which provides that an expert witness may testify

about the ultimate question of fact, but does not allow the expert to "instruct the jury how it should rule, if the expert does not provide any basis for that opinion." *Id.* The court said that while an expert may not state legal conclusion by applying the law to the facts, the expert may refer to the law in expressing his/her opinion. *Id*. at 95, *quoting United States v. Bedford*, 536 Fed.3d 1148, 1158 (10th Cir. 2008). The Court in *Richter* recognized the close line between permissible expert testimony addressing the ultimate issue versus "supplanting" the judgment of the jury and, at the same time, recognized that experts are allowed to testify as to how the law applies to facts as long as the expert provides adequate explanations for the experts conclusions. The Court in *Richter* wrote as follows:

> "To be admissible, an expert's testimony must be helpful to the trier of fact. Fed.R.Evid. 702. To ensure testimony is helpful, "[a]n expert may not state legal conclusions drawn by applying the law to the facts, but an expert may refer to the law in expressing his or her opinion." *United States v. Bedford*, 536 F.3d 1148, 1158 (10th Cir.2008) (internal quotation marks and alterations omitted). "The line between a permissible opinion on an ultimate issue and an impermissible legal conclusion is not always easy to discern." *United States v. McIver*, 470 F.3d 550, 562 (4th Cir.2006). Permissible testimony provides the jury with the tools to evaluate an expert's ultimate conclusion and focuses on questions of fact that are amenable to the scientific, technical, or other specialized knowledge within the expert's field. *United States v. Dazey*, 403 F.3d 1147, 1171-72 (10th Cir.2005) ("Even if [an expert's] testimony arguably embraced the ultimate issue, such testimony is permissible as long as the expert's testimony assists, rather than supplants, the jury's judgment.").

> As a result, "an expert may not simply tell the jury what result it should reach without providing any explanation of the criteria on which that opinion is based or any means by which the jury can exercise independent judgment." *Id*. at 1171. Expert testimony of this sort has been excluded alternatively "on the ground that it usurps the function of the jury in deciding the facts," or because it "interferes with the function of the judge in instructing the jury on the law." *Id*. at 1171 (internal quotation marks omitted). Witnesses are permitted to testify about how the law applies to a certain set of facts, so long as they

provide adequate explanations for their conclusions. *Id.; see, e.g., United States v. Buchanan*, 787 F.2d 477, 483-84 (10th Cir.1986) (affirming admission of expert testimony that a homemade device was a firearm and therefore needed to be registered with the Bureau of Alcohol, Tobacco, and Firearms); *United States v. Logan*, 641 F.2d 860, 863 (10th Cir.1981) (an expert may testify about how certain funds were classified by law).

Here, the government offered Mr. Smith's testimony regarding what constitutes waste under Colorado law in an effort to rebut Mr. Richter's testimony that the intact CRTs exported by Executive could be reused as television monitors and therefore were not waste. Specifically, Mr. Smith was asked whether it is "the original intended purpose if someone takes the CRT out of its housing and uses it to make another CRT." He answered, "No, it's not the original intended purpose. It has to be direct use or reuse without processing." But Mr. Smith did not provide a basis for his claim that processing alters the purpose for which a CRT is used or "provid[e] any explanation of the criteria on which [his] opinion [was] based or any means by which the jury [could] exercise independent judgment." *Dazey,* 403 F.3d at 1171. Rather than providing a useful explanation for the jury, Mr. Smith simply opined that "processing" somehow required that they find the CRTs are waste, even if the defendants exported them intact for reuse in monitors. And he did so without providing any explanation of what constitutes "processing" or how it impacts the original intended purpose requirement. *Cf. United States v. Schneider*, 704 F.3d 1287, 1294 (10th Cir.2013) (noting that while an expert may refer to the law in expressing an opinion, testimony raises concerns "when an expert uses a specialized legal term and usurps the jury's function"); *McIver*, 470 F.3d at 552 (expert testimony's overreliance on terms that "have a separate, distinct and specialized meaning in the law different from that present in the vernacular" risks crossing the line into unhelpful and inadmissible testimony (internal quotation marks omitted)). Thus, the district court erred, by permitting Mr. Smith to provide a bare legal conclusion without explaining the criteria he used to reach that conclusion." *Id*. at 1195-1196.

The Court of Appeals in *Richter* clearly recognized that there exists a fine line between permissible expert testimony where the expert discusses the law as opposed to the expert telling the jury what the jury should ultimately decide based on the law, not based on the facts. In the present case, Dr. Lawrence will not cross that line. However, before

discussing the content and nature of Dr. Lawrence's opinions as set forth in her Report and as discussed with defense counsel during deposition, it is appropriate to discuss one (1) other case cited by the defendant, but which is not applicable in the present case.

Defendants cites *Bley v. Independent School District No. 1-002* of Oklahoma County, Case No. CIV-21-1026-R, 2023 WL 3608909 (WD Okla. May 9, 2023) regarding a attorney who had been retained as an expert in employment law and whose Report, according to this court, contained legal conclusions that would "supplant, rather than assist, the jury's judgment . . . ." *Id.* at 5. *Bley* is substantially different from the present case. In *Bley*, this Court referred to the attorney expert Report as simply containing legal conclusions that did not assist the jury.

Content of the attorney experts report and opinions in *Bley* were basically a statement by the attorney expert addressing the reasonableness of accommodations or attempted accommodations made by the school district employer during the time of the recent pandemic. *See* Report of Christine Cave, J.D., Doc. No. 64-1, in *Bley*, Case No. CIV-21-1026-R. The attorney expert did not really provide information assisting the jury on questions of reasonable accommodations, but, rather, opined as to matters of law which would normally be given to the jury by means of the court's jury instructions. In disallowing the report and testimony of the attorney expert in *Bley*, this Court took particular note regarding the Tenth Circuit's view of attorney experts creating a "substantial danger" that the jury will simply follow the conclusions of the attorney expert as opposed to making its own decision. *Bley, at 5, citing Specht v. Jensen*, 853 F.2d 805, 809 (10th Cir. 1988). In *Bley*,

the Court stated that the attorney expert therein, after summarizing facts, provided conclusions that the defendant School district had failed to comply with the law and that the attorney expert had "applied the law to the facts" which is what the jury is supposed to do. *Id.* This Court said in *Bley:*

> "Ms. Cave's report is largely a summation of the facts followed by her conclusion that Defendant failed to comply with the ADA or FMLA in some way. Put another way, the report applies the law to the facts to reach legal conclusions on the very issues the jury will be required to resolve at trial. And, problematically, the report does not clearly identify any specific human resources practices or industry standards that inform her conclusions other than her understanding as to what is required by the ADA or FMLA. Moreover, as the Tenth Circuit has recognized, "[t]here is a significant difference between an attorney who states his belief of what law should govern the case and any other expert witness." Specht, 853 F.2d at 808. When an attorney testifies as an expert witness, "there is a substantial danger the jury" will "simply adopt[] the expert's conclusions rather than making its own decision." Id. at 809. Ms. Cave's report contains legal conclusions that will supplant, rather than assist, the jury's judgment and they are therefore inadmissible. United States v. Dazey, 403 F.3d 1147, 1171–72 (10th Cir.2005) ("Even if [an expert's] testimony arguably embraced the ultimate issue, such testimony is permissible as long as the expert's testimony assists, rather than supplants, the jury's judgment.")." *Id.*

Its critical to note that in *Bley* this Court emphasized as "problematic" the fact that the attorney expert did not identify specific human resources standards or practices or industry standards that informed her conclusions. In *Bley*, the attorney expert was not relying upon her experience, training, education or special knowledge to assist the jury on matters which were beyond the scope of a lay persons ability to understand or evaluate factual material under the instructions of the Court. Here, Dr. Lawrence is, in fact, providing expert testimony regarding standard of medical care on medical matters that are not regularly known among

lay persons which will assist the jury in understanding the many medical emergencies associated with severe abdominal pain, tachycardia burning of abdomen, weakness to the point of not being able to stand, etc, as exhibited by Sindi Spray.  Dr. Lawrence is able to opine to the effects of the duodenal ulcer and how it can be addressed in an hospital setting and corrected emergently with surgery. This is vastly different than the situation in *Bley*.

In the present case, Dr. Lawrence does not attempt to tell the jury what the law is. She does not attempt to testify or provide opinions as a lawyer, but only as a Board Certified Internal Medicine physician and an physician whose worked in jail or prison settings. The defendant attempts to prejudice Dr. Lawrence and the plaintiff by stating that she is an attorney and therefore, for whatever reason , her opinions on medicine, should be excluded. It must be remembered that Rule 26 (a)(2), requires the expert to provide "the basis and reasons" for all opinions and "the facts or data considered by the witness informing" all opinions. Fed.R.Civ.P.26(a)(2)(B)(i) and (ii). In her Report, Dr. Lawrence did precisely this. Dr. Lawrence complied with all the content requirements of a Rule 26 report and then, in detail, summarized the critical entries from Sindi Spray's medical record and, under each opinion, provided a detailed recitation for the basis for her opinion which, includes a recitation of the facts pertinent to that opinion. Dr. Lawrence's Report is not simply a recitation of the facts set forth in the amended complaint. However, it is a recitation which reflects Dr. Lawrence's detailed evaluation of the materials which she reviewed.

It reflects her keen understanding of the medical facts in the case. Dr. Lawrence has stated under oath that her reference to the County's unconstitutional conduct or violations

was not intended to be in the sense of telling the jury the law, but rather was reflective of her reading of the 2008 DOJ Report discussing inadequate medical care and the 2009 MOU where the County had pledged to the DOJ to address specific staffing, training, funding and medical care issues all relating to the provision of constitutionally required medical care.

The DOJ Report specifically referenced detainees "not being provided adequate access to medical care and in particular acute services-with dire results." *See* DOJ Report, Exh. 4, at 13. The DOJ also found that the jail did "not adequately screen detainees for serious medical problems". *Id.* DOJ also found "problems providing appropriate access to medical care during emergencies." *Id*. at 14. DOJ found that the Jail was not "adequately staffed to maintain necessary supervision of detainees to secure their safety." *Id*. at 4. The DOJ recognized that their were only 1 or 2 detention officers to supervise a single floor with hundreds of detainees and that sight checks were compromised. *Id.* In concluding, the DOJ made numerous recommendations including: (1) Providing an adequately trained staff capable of responding to serious incidents, conducting adequate staff rounds, and "promptly responding to medical and other emergencies; (2) "Timely assessment, identification and treatment of detainees' medical and mental healthcare needs, " including providing qualified medical staff to screen for serious medical conditions, providing timely and appropriate treatment for serious medical conditions, etc. *See* Exh. 4 at 20-22.

In her Report, Dr Lawrence specifically quoted or cited provisions of the MOU where Oklahoma County had pledged to resolve specific items of staffing of security personnel, staffing of medical personnel, providing training to implement provisions of the MOU,

providing sufficient qualified medical staff, addressing the serious medical needs of detainees, addressing timely response to writn sick call requests, and training medical and security staff so as to recognize and respond to medical emergencies. Dr. Lawrence's opinions regarding constructional violations flow directly, not from her reading of case law, but from her understanding of the findings set forth in the DOJ Report and the requisites of the MOU. *See*, Exh. 3, Depo. of Dr. Lawrence at 35:18-25, 36:1-10, 37:9-25, 38:1-6, 39:1-13, 40:18-25, 42:10-14 and 45:2-6.

The subject of Dr. Lawrence using the phrase "constitutional violation," is easily remedied by means of a limitation of testimony, as opposed to a disqualification of Dr. Lawrence. Dr. Lawrence should be allowed to opine that her review of this case indicates that the findings of the DOJ report and the resulting of the requisites of the MOU have still not been satisfied. That is not a legal opinion. Rather it is recognition by a doctor that detainees' serious medical needs are not being addressed and that the requirements of the MOU pertaining to staffing, training regarding recognition of medical emergencies, and provision of adequate and proper medical care continues to be deficient and in violation of the MOU.

On Page 4 of its Motion, the defendant provides a lengthy footnote attacking the use of the DOJ Report and MOU, claiming that Western District courts have often held that the DOJ Report and the MOU were to remote in time to be relevant to the facts of a specific case. The defendant's reliance upon the cases cited in its Footnote 2 is misplaced, as the plaintiffs are not using the DOJ Report and the MOU to make a direct comparison to the

Sindi Spray event, but, rather, to show the continued pattern and custom of lack of attention to the medical needs of detainees and the continued pattern and custom of lack of attention to other corollary matters directly contributing to continued bad medical care at the Jail. The defendant cites *Foreman v. Okla. Cty Sheriff*, No. CIV-21-1062-F 2022 WL 2513384 (WD. Okla. July 6, 2022). (Where the court had before it a Rule 12(b)(6) motion to dismiss, and where the Court ruled that the DOJ Report, while dealing with inadequate supervision and staffing, inadequate medical and mental healthcare, over crowding and high rates of assault, the plaintiffs did not allege any facts to connect the Report to the incidents in *Foreman*.) *Id.* at 8.

In *Carskadon v. Armor Correctional Health Services, Inc.*, CIV-18-1013-G, 2022 WL 2813526*8 (May 29, 2020), ( the court had before it another Rule 12(b)(6) motion to dismiss) in that case, the court found, according to the allegations, that physicians had actually had been contacted to address the decedents condition and had ordered treatment consistent with the decedents symptoms. The Court agreed that the treatment consistent with treatment by a physician consistent with symptoms precluded any inference of deliberate indifference as to the county. *Id.* at 11-12. The Court in *Carskadon* specifically stated that the DOJ Report ***was relevant*** in that case regarding failing to meet a detainees serious medical needs, the inadequate screening of detainees for medical problems and the failure to provide appropriate access to medical care during emergencies. *Id.* at 17. The plaintiff therein further referenced the MOU as part of her allegations. Regarding the Board's Motion to Dismiss, the Court repeated that the plaintiff had not pled sufficient facts to show

deliberate indifference in light of the decedent being seen by a physician and being treated according to the physicians judgment. Regarding the DOJ Report and the MOU, the court said that the claims based on the Report or the MOU are speculative and insufficient. Contrary to the statements of the defendants herein, the Court in *Carskadon* made no finding or statement to the effect that the DOJ Report or the MOU were "to remote in time". *Id.* at 18-19. Rather, the Court said that the plaintiff did not allege that the decedent suffered any of the deficiencies outlined in the DOJ Report or the MOU. *Id.*

*In Willis v. Oklahoma Cnty. Det. Ctr..* No. 18-CV-00323-D 2019 WL 4409219, WL 4409219, at *6 (W.D. Okla. Sept. 13, 2019), The court had before it another Rule 12 (b)(6) Motion dealing with claims of excessive force. In *Willis*, the plaintiff made reference to the DOJ Report alleging that the Report was evidence that the defendant Sheriff and defendant Board should have known that the conditions in the jail would cause ***"others"*** to deprive the decedent of his constitutional rights. The Court in *Willis* recognized that the DOJ Report did express concern about use of force and excessive physical restraints but that the DOJ Report made no specific mention of the type of force that was used on the decedent in *Willis*.

Judge DeGuisti's Orders in *Willis* predate by 4 (four) years the Grand Jury Report issued on March 23, 2023. Almost all of the cases cited in defendant's No.2 predate the Grand Jury Report, except for this Court's Order in *Bley, Supra*., and the Grand Jury report was not mentioned to the Court in the *Bley* case. Ironically, the plaintiffs response to the motion to exclude in *Bley*, was filed on March 23, 2023, (Doc. No. 72) which was the same day that the Grand Jury report was filed and, therefore, it could have not even been presented

to the Court as in the present case. The Multicounty Grand Jury has now clearly recognized the relationship between the DOJ Report, the MOU and the continuing deficiencies at the Oklahoma County Jail including funding, staffing, training if security and medical personnel regarding medical emergences, lack of proper sight checks, among many other deficiencies. Respectfully, the duly constituted Multicounty Grand Jury for the State of Oklahoma does recognize a connection between current conditions and events at the Jail consistent with those referenced in the DOJ report and the MOU. The plaintiffs' use of the DOJ Report and the MOU in the present case, is supported and substantiated by the Report of the Multicounty Grand Jury, *i.e.*, that the Board of County Commissioners has a governing body of Oklahoma County and the policy and decision makers regarding the Oklahoma County Jail have prior to, during and after the time of Sindi Sprays event been derelict in addressing, much less resolving, the constitutional deficiencies referenced by the DOJ in its 2008 Report and in the MOU where Oklahoma County promised to rectify those constitutional deficiencies.

It is important to recognize that the plaintiffs in the present case do not employ the DOJ Report and the MOU to make a direct comparison to Sindi Spray's malady. Rather, the DOJ Report, the MOU and noe the Grand Jury Report, combine to show a continued pattern of conduct, custom, continued deficient staffing, continued deficient funding continued deficient training of security and medical personnel particularly as to the signs and symptoms of medical emergencies, the continued excessive loss of life at the jail, and the overall continued attitudes of county and Jail decision-makers and policy-makers—all of which evidences the County's deliberate indifference toward the constitutionally guaranteed and

protected medical care for detainees such as Sindi Spray.

The defendant's attack on the use of the DOJ Report and the MOU is misplaced as the plaintiffs desired use of the DOJ Report and MOU have nothing to do with Dr. Lawrence's qualifications. Indeed, the defendant makes no mention of Dr. Lawrence's extensive qualifications which include a medical degree from Baylor, an internal medicine residency in New York, a two (2) year fellowship in hematology/oncology at the University of Texas (Galveston Branch), Board Certification in internal medicine and in medical oncology, many years of work as a physician and/or medical director at a federal detention facility, staff physician at a VA medical center, treating patients with HIV, hepatitus, cancer, and other internal medicine issues, over a decade acting as a prisoner healthcare consultant, private practice in internal medicine, membership in the American College of correctional physicians, not to mention the many awards and accolades she has received. Dr. Lawrence's methodology includes reviewing all medical records, all depositions (none of which were ever given to Dr. Herrington) observing the before and after videos of Sindi Spray, listening to the audios of Sindi Sprays telephonic conversations reviewing all witness statements and investigative reports and then as specifically authorized by Rule 702, may use of her "knowledge, skill, experience, training and education" to formulate her opinions. Moreover, the defendant fails to mention that Dr. Lawrence has testified in federal courts both by deposition and in court testimony as ell as numerous state courts. *See* Dr. Lawrence's Report, Defendants Exhibit 1, at 3-5. As Dr. Lawrence states at Page 5 of her report and also during deposition testimony, she has never been excluded as an expert witness to her knowledge

and, until the present case, has never even been the subject of a motion to exclude. Def. Exh.

1 at 5 and Pl.'s Exh. 3 Depo. of Dr. Lawrence at 30:7-25, and 31:1-13.

## II.    THE ENTIRETY OF DEFENDANTS PROPOSITION III. DEALS WITH CERTIAN TYPES SOF MEDICAL CARE PROPRITLY NOT RISING TO THE LEVEL OF CONSTITUTIONAL VIOLATIONS, ALL OF WHICH ARE IRRELEVANT TO THE SUBJECT OF DR. LAWRENCE'S QUALIFICATIONS AS AN EXPERT.

In its Proposition III, the defendant cites numerous cases stating, *e.g.*, that failure to

provide a test, failure to transfer to another facility, delays in transfer, and the like, do not

necessarily rise to the level of a constitutional violation. None of this has anything to do with

Dr. Lawrence's qualifications to render expert medical testimony. The defendant, simply

wishes to use its *Daubert* Motion as a means to assert that, on the merits, there is no

constitutional violation. This would be a subject for Motion for Summary Judgment and not

a *Daubert* motion challenging the qualifications or reliability of an expert' s opinions.

Respectfully submitted,

s/ Danny K. Shadid
Danny K. Shadid, OBA No.8104
DANNY K. SHADID, P.C.
6307 Waterford Blvd., Suite 230
Oklahoma City, OK 73118
Phone: (405) 810-9999
E-mail:Danny@ShadidLaw.com
*Attorney for Plaintiff*

CERTIFICATE OF SERVICE

I hereby certify that on the 31st day of July, 2023, I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing.  Based on the records currently on file, the Clerk of Court will transmit a Notice of Electronic Filing to the following ECF registrants:

Aaron Etherington, OBA#18259
Rodney J. Heggy, OBA#4049
Assistant District Attorneys
320 Robert S. Kerr, Suite 505
Oklahoma City, Oklahoma 73102
Telephone: (405) 713-1600
Facsimile: (405)713-1749
rod.heggy@Oklahomacounty.org
aaron.etherington@oklahomacounty.org
*Attorneys for Defendant Board of County*              *s/Danny K. Shadid*
*Commissioners*                                         Danny K. Shadid