**IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF OKLAHOMA**

**WILLIAM RAY SPRAY, JR., and RHONDA JEAN SPRAY, individually and as Personal Representatives of the Estate of Sindi Lucille Spray, deceased,**

**Plaintiffs,**

**v.**

**BOARD OF COUNTY COMMISSIONERS OF OKLAHOMA COUNTY, in its Official Capacity as Governing Body of the County of Oklahoma County,**

**Defendant.**

**No. CIV-20-1252-R**

**ORDER**

Sindi Spray was booked into the Oklahoma County Detention Center on December 13, 2018, at 10:30 a.m. She died three days later from a perforated duodenal ulcer that was leaking fluid into her abdominal cavity. In the hours immediately preceding her death, Ms. Spray appeared to be in pain and was unable to walk on her own. Although jail staff observed and were notified of the changes in her condition, she did not receive any medical attention for these symptoms. Ms. Spray's parents, as personal representatives of her estate, brought this action under 42 U.S.C. § 1983 alleging that the deprivation of medical care violated the Fourteenth Amendment of the U.S. Constitution. Defendant Board of County Commissioners of Oklahoma County now moves for summary judgment on this claim. The matter is fully briefed and at issue [Doc. Nos. 50, 64, 69].

## FACTUAL BACKGROUND

### A. Ms. Spray's Medical Treatment and Death

Ms. Spray was booked into the Oklahoma County Detention Center on December 13, 2018, at 10:30 a.m. in connection with a bench warrant that was issued after she failed to appear at a preliminary hearing.[1] She was screened by medical personnel at the jail at the time of booking. She reported that she was a heroin addict and was experiencing withdrawal symptoms, including cold, chills, sweating, running nose, restlessness, and back pain. Def. Ex. 9. The jail screening report indicates that the "Continuity of Care Plan" for Ms. Spray was "withdrawal/detox monitoring" and she was prescribed some medications to assist in the withdrawal. *Id.*; Pl. Ex. 22.

While incarcerated at the jail, Ms. Spray was administered medications and her blood pressure and pulse rate were taken at least once a day. Def. Ex. 11; Pl. Ex. 22. On the morning of December 16th – the day of her death – Ms. Spray was taken to the jail medical clinic after complaining of shortness of breath. Def. Ex. 12. At the clinic, she was seen by Shirley Reisch, a registered nurse. *Id.* In her chart note,[2] Nurse Reisch wrote that Ms. Spray complained of shortness of breath, body aches, and pain when breathing; Ms. Spray felt like she was over the worst of her heroin withdrawal but still felt really bad; and Ms. Spray had a steady gait, no signs of distress, and no difficulty breathing. *Id.* After this visit, Ms. Spray walked from the medical clinic to her cell without assistance. Pl. Ex. 16.

---

[1] Defendant's Statement of Undisputed Material Facts repeatedly states that Ms. Spray was arrested and booked into the jail in August 2018, but the evidentiary materials show the date as December 13, 2018.

[2] The jail records indicate that the chart note was entered after Ms. Spray died. Def. Ex. 12.

That afternoon, at approximately 12:30 p.m., medical assistant Ginger Vann, accompanied by detention officer Corporal Alexis Breshers, began making the rounds for the noon time med pass, where medications are distributed to inmates in their cells. Pl. Ex. 22; Ex. 25 at 40, Ex. 26 at 62. When Ms. Vann arrived at Ms. Spray's cell, Ms. Spray leaned against the wall, slid down to the floor, and reported that her stomach hurt and her legs were not working. Ms. Spray took her medications while seated on the floor and had to be helped up to get back into the cell.[3] Ms. Vann testified that Ms. Spray could not walk, "she knew she needed help[,]" and she "obviously" needed to go to the hospital. Pl. Ex. 25 at 37, 42-44, 69. Ms. Spray's cellmate similarly testified that Ms. Spray slid down to the floor, complained about stomach pain, and had to be helped back inside the cell. Pl. Ex. 24 at 48-53. Cpl. Breshers also observed that Ms. Spray slid down to the floor and scooted across the cell to get her medications. Pl. ex. 26 at 62, 69-70.

Concerned about Ms. Spray's condition, Ms. Vann helped Ms. Spray fill out a sick call request. Pl. Ex. 25 at 56. Ms. Vann testified that she took the request to Nurse Reisch in the clinic and told her that Ms. Spray's stomach hurt, she couldn't walk, and she "needs to be sent out" to the hospital. According to Ms. Vann, Nurse Reisch responded by stating "she's fine" and that she had already seen Ms. Spray for a breathing treatment that morning. Pl. Ex. 25 at 37, 47-50.

[3] A video recording from the jail [Doc. No. 64-17] shows Ms. Spray sitting on the floor and being helped back into her cell. However, the view of Ms. Spray's cell is obscured by a column.

Ms. Vann also testified that she told Cpl. Breshers that Ms. Spray needed to be sent out to the hospital. *Id.* at 48. Cpl. Breshers' acknowledged that Ms. Vann told her to keep an eye on Ms. Spray because she was not walking, and her testimony suggests that she did not know whether Ms. Spray's condition was reported to the medical clinic. Cpl. Breshers conceded that Ms. Spray could have received additional medical attention. Pl. Ex. 26 at 58, 70, 74; Pl. Ex. 32.

Jail records indicate that the 2:00 p.m. sight check of Ms. Spray's floor was not completed. Pl. Ex. 45 at 9. Around 3:30 that afternoon, Cpl. Breshers delivered a mat to the cell and observed Ms. Spray lying down. Cpl. Breshers conducted a sight check of the pod during the 4:00 p.m. hour but her report indicates that she did not look in Ms. Spray's cell during the sight check. Ms. Spray's cellmate testified that no one looked in the cell during the sight check. Pl. Ex. 32; Ex. 26 at 73-74, 77; Ex. 24 at 117.

At around 4:56 p.m., detention officers were notified to respond to Ms. Spray's cell because an inmate was having trouble breathing. Cpl. Breshers arrived at the cell several minutes later, called for help, and began chest compressions. Pl. Ex. 32. Ms. Spray's cellmate testified that she beat on the cell door and called for help for forty minutes before anyone responded. Pl. Ex. 24 at 64. However, she also testified that she believed Ms. Spray was dead when she found her on the floor.[4] Def. Ex. 33 at 61-62 It was subsequently

[4] Plaintiffs do not dispute that Ms. Spray was found dead when she was discovered by her cellmate. *See* Def. Undisputed Fact No. 22. Accordingly, the delay in responding to the cell could not have caused a constitutional violation and any facts related to this delay are not material.

determined that Ms. Spray died from a perforated duodenal ulcer that was leaking fluid into her abdomen. Def. Ex. 18.

**B. The Oklahoma County Detention Center**

Each floor of the Oklahoma County Detention Center has four pods with 50 cells. Typically, only one detention officer is assigned to the floor at any given time. Pl. Ex 44 at 73. Detention officers are expected to conduct hourly sight checks of each cell. Pl. Ex. 58. Although detention officers testified that a sight check cannot be completed in under four minutes, the jail records include numerous entries showing sight checks taking less than 4 minutes. Pl. Ex. 25 at 25-27; Ex. 44 at 68-71; Ex. 45. There is also testimony that the jail medical personnel would routinely ignore sick call requests or throw them in the trash, that jail medical staff and detention officers complained that inmates were not being seen by medical personnel, and that the jail has been understaffed for a long time. Pl. Ex. 25 at 55, 57-60, 63-65; Pl. Ex. 42 at 123:16-22; Pl. Ex. 44 at 73.

**STANDARD**

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "An issue is 'genuine' if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way.... An issue of fact is 'material' if under the substantive law it is essential to the proper disposition of the claim." *Adler v. Wal-Mart Stores, Inc*., 144 F.3d 664, 670 (10th Cir. 1998) (citing *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986)). Importantly, at this stage, the court's role is not "to weigh the evidence and determine the truth of the matter," but to determine

"whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 249–52. "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id*. at 255.

**DISCUSSION**

Plaintiffs' Amended Complaint[5] asserts that the Board of County Commissioners of Oklahoma County failed to provide Ms. Spray with constitutionally adequate medical care in violation of the Fourteenth Amendment. To succeed on this claim, Plaintiffs must demonstrate (1) a violation of Ms. Spray's constitutional rights and (2) that a policy or custom of the defendant was the moving force behind the constitutional violation. *Layton v. Bd. of Cnty. Comm'rs of Oklahoma Cnty*., 512 F. App'x 861, 868 (10th Cir. 2013). Defendant argues that Plaintiffs' claim fails as a matter of law at both steps.

**I. Underlying Constitutional Violation**

The Fourteenth Amendment's Due Process Clause affords a pretrial detainee protection against deliberate indifference to a substantial risk of serious harm. *Burke v. Regalado*, 935 F.3d 960, 991-92 (10th Cir. 2019). "Deliberate indifference contains both an objective and subjective component." *Lucas v. Turn Key Health Clinics, LLC*, 58 F.4th 1127, 1136 (10th Cir. 2023). The objective component is satisfied "if the deprivation is sufficiently serious—that is, if it is one that has been diagnosed by a physician as mandating

[5] Defendant cites to the Complaint in its summary of Plaintiffs' claims. *See* Def. Br. at 4. However, the Complaint was superseded by the filing of Plaintiffs' Amended Complaint. *See Franklin v. Kansas Dep't of Corr*., 160 F. App'x 730, 734 (10th Cir. 2005).

treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1315 (10th Cir. 2002) (quotation marks and citation omitted). Here, Defendant concedes for the sake of its summary judgment motion that the objective component is met.

The subjective component of deliberate indifference is satisfied if

> the official knows of and disregards an excessive risk to inmate health or safety. The official must be aware of the facts from which the inference of a substantial risk of serious harm could be drawn and also draw that inference. A plaintiff need not show that a prison official acted or failed to act believing that harm actually would befall an inmate, but rather that the official merely refused to verify underlying facts that he strongly suspected to be true, or declined to confirm inferences of risk that he strongly suspected to exist. Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence such as whether the risk was obvious. An official disregards risk when he fails to take reasonable measures to abate the risk.

*Lucas*, 58 F.4th at 1137 (quotation marks and citations omitted).

Plaintiffs have presented sufficient evidence from which a reasonable juror could conclude that jail staff[6] subjectively perceived an excessive risk to Ms. Spray's health and

[6] Defendant asserts, and Plaintiffs do not dispute, that the medical personnel at the jail were employees of Turn Key Health Clinics, LLC and not the Oklahoma County Detention Center. *See* Def. Br. at 9 n.5. Defendant's brief also repeatedly argues it cannot be liable because there is no evidence that a *county* employee acted with deliberate indifference. To the extent Defendant means to argue that the county cannot be liable for the actions of Turn Key employees that were working in the jail, the Court perceives two problems with such an argument. First, there is evidence that at least one detention officer failed to take appropriate action after observing Ms. Spray's deteriorating condition and being told she needed to go to the hospital. Second, the Tenth Circuit has held that constitutional violations by jail medical contractors can form the basis of a claim against the county. *Burke v. Regalado*, 935 F.3d 960, 996-97, n.17 (10th Cir. 2019) ("For municipal liability, courts have held entities liable for the actions of independent contractors."); *see also Layton*, 512 F. App'x at 871 (reversing grant of summary judgment because county could

failed to take reasonable measures to abate that risk. First, there is evidence showing that jail staff actually inferred that Ms. Spray was facing a substantial risk of serious harm. During the noon med pass on December 16th, Ms. Vann and Cpl. Breshers both observed that Ms. Spray was in pain and could not walk. According to Ms. Vann, it was obvious that Ms. Spray needed to go to the hospital and she conveyed this to Nurse Reisch and Cpl. Breshers.

Second, Plaintiffs provide sufficient evidence showing that jail staff disregarded the risk to Ms. Spray and manifested indifference to her obvious need for medical care. For example, Nurse Reisch refused to provide any medical care to Ms. Spray after she was informed that Ms. Spray's condition had changed significantly and she needed to go to the hospital. *See Mata v. Saiz*, 427 F.3d 745, 755-59 (10th Cir. 2005) (denying summary judgment to nurse who was informed that the patient was experiencing chest pain but "completely refused to assess or diagnose [the plaintiff's] medical condition at all"). Additionally, there is evidence that Cpl. Breshers – although aware of Ms. Spray's serious medical need – did not report her condition to anyone or adequately monitor her cell. *Brothers. v. Bd. of Cnty. Commissioners of Oklahoma Cnty*., No. CIV-21-418-SLP, 2023 WL 4041854, at *8 (W.D. Okla. June 15, 2023) (finding that "a question of fact exists as to whether the detention staff failed in their gatekeeping duties" where there was evidence

be liable for actions of contracted jail medical providers). Moreover, although Defendant cites to a portion of the contract governing Turn Key's operations, it did not submit a copy of the contract. It is therefore impossible to determine the scope of authority the county sheriff or the Board of County Commissioners continued to exercise over the medical staff.

that inmate was in obvious need of medical assistance). This is not to suggest that Plaintiffs' evidence will carry the day at trial, but it is sufficient to create a material factual dispute.

Defendant argues that there is no evidence suggesting that detention staff thought Ms. Spray was suffering from anything other than heroin withdrawal. This is beside the point. Whether from heroin withdrawal or some other problem, Ms. Spray's condition changed on the afternoon of December 16th. There is evidence that jail staff were aware of Ms. Spray's changed condition, knew that it presented an excessive risk to her health, and disregarded that risk. Defendant additionally argues that detention officers provided her with access to medical care at every moment of need. Although Plaintiff did receive some medical attention at the jail, whether jail personnel responded appropriately after observing or being informed that she could not walk is disputed.

**II. Municipal Policy or Custom**

To succeed on a claim against a local government entity such as the Board of County Commissioners, the plaintiff must, in addition to establishing an underlying constitutional violation, prove that (1) a government's official policy (2) caused the constitutional injury and (3) the policy was enacted or maintained with the requisite state of mind, i.e. deliberate indifference. *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 769 (10th Cir. 2013). In addition to a formal regulation or policy statement, an official policy can include "an informal custom amounting to a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law." *Waller v. City & Cnty. of Denver*, 932 F.3d 1277, 1283 (10th Cir. 2019) (quotation marks and citation omitted).

Plaintiffs have presented sufficient evidence from which a reasonable juror could conclude that the jail maintained an informal but well-settled custom of providing deficient medical care and supervision. There is testimony that jail medical staff would routinely ignore sick call requests and that both medical staff and detention officers complained about inmates not receiving medical care. The jail was consistently understaffed, only one detention officer was assigned to each floor as a matter of course, and detention officers routinely failed to perform their required sight checks. *See Burke*, 935 F.3d at 999 (describing understaffing and failure to provide timely medical care to inmates as a "policy or custom of providing deficient medical care at the jail").

A reasonable juror could also conclude that these deficiencies caused Ms. Spray's death. Although Ms. Spray exhibited a worrying change in symptoms, her sick call request was ignored and her cell was not appropriately monitored. *See Layton*, 512 F. App'x at 872 (10th Cir. 2013) ("Notably, a reasonable jury could find that, had Mr. Holdstock's cell been monitored on a more regular basis, prompt intervention would have prevented his death.").

There is also evidence from which a reasonable juror could conclude that Defendant acted with deliberate indifference. "The deliberate indifference standard may be satisfied when the municipality has actual or constructive notice that its action or failure to act is substantially certain to result in a constitutional violation, and it consciously or deliberately chooses to disregard the risk of harm." *Barney v. Pulsipher*, 143 F.3d 1299, 1307 (10th Cir. 1998). Typically, notice is "established by proving the existence of a pattern of tortious conduct." *Id*. However, deliberate indifference may also "be found absent a pattern of unconstitutional behavior if a violation of federal rights is a highly predictable or plainly

obvious consequence of a municipality's action or inaction." *Id*. (quotation marks and citation omitted). A jury could reasonably conclude that a violation of a pretrial detainee's Fourteenth Amendment rights is a "plainly obvious consequence" of the jail's purported custom of ignoring requests for medical care and failing to monitor sick inmates. *See Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1320 (10th Cir. 2002) (holding that where there was evidence that a constitutional violation was a plainly obvious consequence of failure to train it was "for a jury to decide" whether municipality acted with deliberate indifference); *Winton v. Bd. of Comm'rs of Tulsa Cnty., Okl*., 88 F. Supp. 2d 1247, 1269-70 (N.D. Okla. 2000) (denying county's motion for summary judgment on failure to provide medical care claim where there was evidence sheriff permitted an inadequate sight check practice that "could result in a detention officer failing to timely discover an injured inmate."). Further, there is evidence that the jail's staffing problems, inadequate medical care, and improper sight checks were a pervasive problem and a topic of complaint amongst the staff, suggesting that the decisionmakers at the jail knew (or should have known) of these deficiencies but failed to take any remedial steps. The Court therefore concludes "the evidence presents a sufficient disagreement to require submission to the jury" and is not "so one-sided that [Defendant] must prevail as a matter of law." *Anderson* 477 U.S. at 249-52.

To avoid this outcome, Defendant argues there is no causal connection between any alleged constitutional violation and the conduct of the Board of County Commissioners because the Board has no express statutory authority to act in operating the Oklahoma

County Detention Center.[7] Under Oklahoma law, "[e]very county, by authority of the board of county commissioners and at the expense of the county, shall have a jail or access to a jail in another county for the safekeeping of prisoners lawfully committed." Okla. Stat. tit. 57, § 41. Although the county sheriff is the officer charged with keeping the jail, *see* Okla. Stat. tit. 19, § 513, the county, through its board of county commissioners, "may be liable on the basis that [the sheriff] is a final policymaker with regard to its jail, such that his actions may fairly be said to be those of the municipality." *Lopez v.LeMaster*, 172 F.3d 756, 763 (10th Cir. 1999) (quotation marks and citation omitted); *abrogated in part on other grounds by Brown v. Flowers,* 974 F.3d 1178; *see also Layton,* 512 F. App'x at 871 ("The County may also be liable on the basis that [Sheriff Whetsel] is a final policymaker with regard to its jail….") (internal quotation marks omitted, brackets in original); *Edelen v. Bd. of Comm'rs of Bryan Cnty*., 266 P.3d 660, 665 (Okla. Civ. App. 2011) ("First, the Commissioners may not defeat their potential liability by claiming the Sheriff is in charge of and is the official policy-maker for the county jail.").

Plaintiffs have presented evidence from which it could be inferred that the practice at the jail was to ignore sick call requests and perform incomplete sight checks, the county

---

[7] Judge Cauthron, who was previously assigned to this case, rejected a similar argument when she denied Defendant's motion to dismiss. *See Memorandum Opinion and Order* dated July 27, 2021 [Doc No. 22]. Defendant does not specifically request that the Court reconsider this Order. Additionally, the Court finds Defendant's reliance on *Meade v. Grubbs*, 841 F.2d 1512 (10th Cir. 1988) and its progeny unpersuasive because *Meade* involved individual capacity claims against specific county commissioners, as opposed to a municipal liability claim. *Id.* at 1527-29. *See also duBois v. Bd. of Cnty. Comm'rs of Mayes Cnty*., Oklahoma, No. 12-CV-677, 2014 WL 4810332, at *6-9 (N.D. Okla. Sept. 29, 2014).

sheriff acquiesced to these practices, and he knew or should have known of the risks posed by these practices. The county, via suit against the Board, may be liable for the sheriff's actions (or inaction) with respect to these policies and customs at the jail. Further, given that there is testimony reflecting that jail medical personnel ignored sick call requests on a daily basis, "it is at least arguable that the County's willingness to continue employing [the medical contractor], without sufficient oversight or quality control, could be evidence of deliberate indifference." *Layton*, 512 F. App'x at 871 n.8.

**III. Defendant's Motion to Strike**

Defendant separately moves to strike several exhibits to Plaintiffs' response to Defendant's motion for summary judgment. "[T]he proper mechanism for challenging an opposing party's evidence is to make an objection under Rule 56(c)(2) rather than to file a motion to strike." *Lee v. Burwell*, No. CV 16-366, 2018 WL 4964547, at *1 n.1 (D.N.M. Oct. 15, 2018); *see also* Fed. R. Civ. P. 56, 2010 Advisory Committee Notes ("There is no need to make a separate motion to strike."). However, for the sake of efficiency, the Court will construe Defendant's motion as making an objection.

Defendant objects to a 2021 letter from the jail's medical contractor to the jail complaining about insufficient staffing levels and a 2023 report from an Oklahoma County Grand Jury related to an investigation of the jail.[8] Generally, however, only deficiencies occurring prior to a constitutional violation can "help [the plaintiff] demonstrate the requisite direct causal link between the municipal action and the deprivation of federal

[8] Although the grand jury report references the 2008 DOJ investigation and Memorandum of Understanding, the report primarily focuses on issues occurring after 2018.

rights." *Waller v. City & Cnty. of Denver*, 932 F.3d 1277, 1289 (10th Cir. 2019) (quotation marks and citation omitted). Accordingly, the Court is not persuaded that these documents are relevant and will exclude them at the summary judgment stage.

Defendant also objects to a report issued by the Department of Justice in 2008 concerning conditions at the jail and a Memorandum of Understanding approved by the Board of County Commissioners that outlines the county's obligations regarding the jail. The DOJ report and MOU identify some of the same deficiencies that are involved in this case – namely insufficient staffing resulting in a lack of supervision of detainees and inadequate access to medical care. Pl. Ex. 46 at 4-5, 13-14. Although these documents are too remote in time to establish what conditions were like in the jail during 2018, they may be relevant to whether county officials knew of the risks associated with certain practices and yet failed to take any remedial action. For example, although the DOJ report indicated that staffing only one or two detention officers per floor compromises inmate safety and that sight checks are not conducted as frequently as needed, there is evidence that the jail continued to assign only one detention officer per floor and that detention officers were not performing sight checks. In the Court's view, Defendant's prior knowledge of the risks associated with staffing only one detention officer per floor may have some bearing on whether Defendant acted with deliberate indifference in this matter. Accordingly, the DOJ report and MOU are admissible for the limited purpose of showing that Defendant was aware of the risks associated with certain practices at the jail. Further, the Court believes the documents can be properly authenticated or admitted under a hearsay exception.

Defendant next raises an objection to several exhibits showing that the County failed to pay a medical contractor that worked in the jail. This medical contractor was not involved in Ms. Spray's care and there is no evidence that the County failed to pay the medical contractor involved in this lawsuit. The Court is therefore not persuaded that these exhibits are relevant and will exclude these exhibits at the summary judgment stage.

Last, Defendant objects to Plaintiffs' use of deposition testimony from Sheriff Taylor because he was not listed as a witness. Plaintiffs were permitted to amend their witness list to add Sheriff Taylor and Defendants' objection is therefore denied.

**CONCLUSION**

Construing the facts in the light most favorable to Plaintiffs, the Court concludes that there are material factual disputes that preclude summary judgment on Plaintiffs' Fourteenth Amendment claim. Accordingly, Defendant's Motion for Summary Judgment is DENIED. Defendants' Motion to Strike is GRANTED in part and DENIED in part.

IT IS SO ORDERED this 23rd day of August 2023.

**DAVID L. RUSSELL**
**UNITED STATES DISTRICT JUDGE**